# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *People v. Fields*, 2014 IL App (1st) 130209

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEMONTE FIELDS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-13-0209 |
| Filed<br>Rehearing denied | December 31, 2014<br>January 26, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-13303; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Carson R. Griffis, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justice Rochford concurred in the judgment and opinion.
Justice Hall dissented, with opinion.

**OPINION**

¶ 1      After a bench trial, defendant Demonte Fields was found guilty of aggravated unlawful use of a weapon (AUUW) and sentenced to two years of probation.

¶ 2      On appeal, he contends (1) the trial court erred in denying his motion to quash his arrest and suppress evidence where the police obtained a firearm and inculpatory statement from defendant after arresting him without probable cause; (2) the State failed to prove beyond a reasonable doubt that he was not an invitee of a resident of the apartment building where he was arrested; and (3) his conviction must be vacated because the statute prohibiting the possession of a handgun while under 21 years of age is facially unconstitutional.

¶ 3      For the reasons that follow, we affirm defendant's conviction.

¶ 4                I. BACKGROUND

¶ 5      Defendant was charged with three counts of AUUW based on allegations that he, when not on his own land, in his own abode or fixed place of business, knowingly carried a firearm (count I) that was uncased, loaded and immediately accessible; (count II) while he had not been issued a currently valid firearm owner's identification (FOID) card; and (count III) while he was under 21 years of age. After a bench trial, the court found defendant not guilty of counts I and II and guilty of count III, and sentenced him to two years of probation.

¶ 6      Prior to the bench trial, defendant filed a motion to quash his arrest and suppress evidence, alleging that there was no probable cause to support his arrest. At the hearing on the motion, Chicago police officer M. Mette testified that he was on duty at 1:50 a.m. on July 9, 2012, when he and his partner received an assignment to go to the area of 6935 South Indiana Avenue in Chicago to investigate an anonymous complaint that people were selling drugs there. Officer Mette had been to that building at least a dozen times before. He knew that narcotics were sold in that area, a gang conflict was going on in that building, and members of his team had made narcotics arrests inside that building before. When Officer Mette and his partner arrived in their patrol car, they saw a group of male teenagers and young adults drinking alcohol on the street. The officers told the group to disperse and left to handle another call a short distance away. When the officers returned about 5 or 10 minutes later, the group had not dispersed. The officers, who were in uniform, exited their patrol car, and the group dispersed. According to the anonymous complaint, when the police showed up, the people selling drugs ran inside the building, so Officer Mette and his partner entered the building by randomly ringing some of the doorbells of the building's six apartment units until someone remotely unlocked the door to allow their entry.

¶ 7      Officer Mette testified that he and his partner walked up the stairs and their weapons were holstered. They saw nothing on the first and second floors, but saw defendant sitting on the

landing of the third floor. He was holding his cell phone and shaking visibly. The shaking was unusual and continued throughout the officers' encounter with defendant. Officer Mette could tell that defendant was nervous.

¶ 8        Officer Mette testified that he asked defendant to stand up, but he would not. Officer Mette asked defendant what he was doing there, and defendant said that he was waiting for his mother. Officer Mette asked him how old he was, and defendant said that he was 15. Officer Mette asked him where he lived, and defendant nodded to one of the apartments and said, "Here." However, when Officer Mette asked defendant what his address was, he could not give it. Defendant was asked where his mother was, but he just said that he was waiting for her. Defendant was asked if he had keys to the apartment, and he said that he did not. Officer Mette again asked defendant what his address was, but he could not answer the question. Because defendant claimed he was a minor and was left alone, the officers could not leave him there. Officer Mette again asked defendant where his mother was and his name so Officer Mette could fill out a contact card. When Officer Mette asked for defendant's date of birth, he gave his real birth date–May 22, 1994–which established that defendant had lied and was actually 18 years old.

¶ 9        Officer Mette testified that he decided to bring defendant out to the patrol car, run his name and pull up a picture to verify his identity, so he asked defendant to stand up. Defendant would not stand up, so Officer Mette told defendant he was going to put him in handcuffs and find out who he was. Officer Mette handcuffed defendant while he remained seated. Then, Officer Mette grabbed defendant by his right arm, came kind of underneath him, and lifted him to his feet. The other officer was behind Officer Mette, on the second-floor landing. Officer Mette backed defendant up against the wall on the third floor between the two apartments and heard a big thud as something hit the ground. He looked down and saw a revolver on the ground. Simultaneously, defendant made an incriminating statement regarding the gun. Officer Mette's partner picked the gun up off the ground. The gun was loaded.

¶ 10        Defendant testified that his uncle lived at 6935 South Indiana Avenue and defendant stayed there "once in a while" or about once a week. No one was home at the time of the incident at issue in this appeal. Defendant said he had found a gun in an alley behind the building and was in the building so he "could put it [the gun] up." He wanted to put the gun in a bag and turn it in to the church in exchange for money. He was sitting in the hallway on the third floor waiting for his mother when he heard the apartment door buzzers from different floors. Then he heard the bell that rings when someone is admitted into the building. He heard the door open and saw the police come up the stairs. Officer Mette had his gun out, but his partner did not. Defendant was nervous and shaking because Officer Mette's gun was out, even though it was not pointed directly at defendant. Officer Mette asked defendant what he was doing, and he replied that he was waiting for his mom to come home. When Officer Mette asked defendant the address, defendant did not know the full address. Officer Mette told defendant to get up, but defendant did not want to. Defendant did not feel free to leave, and Officer Mette, by standing in front of defendant, was blocking his exit down the stairs. Officer Mette, using one hand, picked defendant up, and the gun fell out of defendant's shorts and onto the ground. Officer Mette called to his partner, who was on the landing between the second and third floors, to come up and help put handcuffs on defendant. Defendant denied telling the officers that he was sorry he had the gun and had it to protect himself.

¶ 11 The trial court found Officer Mette's testimony credible and denied defendant's motion to quash his arrest and suppress evidence. The trial court stated that, based on the anonymous information about individuals selling narcotics and running into the building and the circumstances the officers observed when they were outside the building, the officers were obligated to investigate. Defendant, who could have been a witness to a criminal offense, was visibly nervous in the stairwell, and the police had a consensual encounter with him. Defendant voluntarily answered their questions but could not give the address and did not tell them his correct age, thereby raising the officers' suspicions. The trial court found that the officers legally detained and handcuffed defendant and, then, when the officers had defendant stand, the gun fell out in plain view without defendant being patted down or searched. Thereafter, the trial court denied defendant's motion to reconsider. In ruling, the trial court noted that defendant looked very young–"anywhere from 12 to 15 years old *** and closer in looks to 12, 13, 14 than to 15."

¶ 12 Defendant proceeded to a stipulated bench trial. In addition to the testimony heard at the hearing on the motion to quash the arrest and suppress evidence, the parties stipulated that the handgun at issue was loaded with five .38-caliber rounds. Moreover, a self-authenticating document established that defendant did not possess a FOID card at the time of his arrest.

¶ 13 The trial court found defendant not guilty of counts I and II, but guilty of count III, which involved knowing possession of a firearm when not on his own land or in his abode or place of business and while he was under 21 years of age. The court sentenced defendant to two years of probation. Defendant appealed.

¶ 14 II. ANALYSIS

¶ 15 On appeal, defendant contends the trial court erred in denying his motion to quash his arrest and suppress evidence where the police obtained a firearm and inculpatory statement from him after arresting him without probable cause. Defendant also contends the State failed to prove beyond a reasonable doubt that he was not an invitee of a resident of the apartment building where he was arrested. In addition, defendant argues that his conviction must be vacated because the statute prohibiting the possession of a handgun while under 21 years of age is facially unconstitutional.

¶ 16 A. Consensual Encounter, *Terry* Stop and Arrest

¶ 17 Defendant contends he was arrested without probable cause when the police put handcuffs on him. Accordingly, defendant asserts that his loaded handgun, which was seized shortly after he was handcuffed, and his oral admission to possessing the handgun should have been suppressed.

¶ 18 A reviewing court accords great deference to the factual findings of the trial court, which will be reversed only if they are against the manifest weight of the evidence, but reviews *de novo* the trial court's ultimate determination to grant or deny the defendant's motion to suppress. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006); *People v. Cox*, 202 Ill. 2d 462, 466 (2002). "On such a motion the defendant bears the burden of proof that the search and seizure were unlawful." *People v. Williams*, 164 Ill. 2d 1, 12 (1994).

¶ 19 The fourth amendment to the United States Constitution guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const., amend. IV.

"Reasonableness under the fourth amendment generally requires a warrant supported by probable cause" (*People v. Johnson*, 237 Ill. 2d 81, 89 (2010)), but the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), recognized an exception to the warrant requirement. Pursuant to *Terry*, "an officer may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere 'hunch.' " *People v. Gherna*, 203 Ill. 2d 165, 177 (2003) (citing *Terry*, 392 U.S. at 27).

¶ 20    Not every encounter between the police and a private citizen results in a seizure. *Luedemann*, 222 Ill. 2d at 544. "Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops,' which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) [consensual] encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Id*. In addition, the "community caretaking function," which refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime, is distinct from the consensual encounter and can also be invoked to validate a search or seizure as reasonable under the fourth amendment. *Id*. at 545, 548. Examples of the community caretaking function include police "responding to heart attack victims, helping children find their parents, helping inebriates find their way home, responding to calls about missing persons or sick neighbors, mediating noise disputes, responding to calls about stray or injured animals, investigating premises left open at night, taking lost property into their possession, and removing abandoned property." *Id*. at 546. "There has never been a requirement that the police must be acting in a community caretaking function to prevent the encounter from turning into a seizure." *Id*. at 549. Furthermore, a police officer can be both acting in his community caretaking function and engaging in a consensual encounter. *Id*. at 548.

¶ 21    The police have the right to approach citizens and ask potentially incriminating questions, and an officer does not violate the fourth amendment merely by approaching a person in public to ask questions if the person is willing to listen. *Id*. at 549. For example, the police may approach a person standing or seated in a public place or seated in a parked vehicle and ask questions of that person without that encounter constituting a seizure. *Id*. at 552.

¶ 22    In a consensual encounter, the issue is not whether the person feels free to leave but, rather, whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter. *Id*. at 550. Factors that may be indicative of a seizure include "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*. at 553. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. *Id.*

¶ 23    Here, the two officers, who were properly investigating a complaint that people dealing narcotics had run inside the building when the officers arrived at the scene, were lawfully allowed into the building. It was about 2 a.m., and Officer Mette knew that drug sales had occurred in that area, a gang conflict was going on in the building, and members of his team had made narcotics arrests in that building before. The officers did not encounter anyone in the building until they approached the third floor and saw defendant sitting on the third-floor landing. We find that the encounter was consensual where there were only two police officers

and the credible testimony of Officer Mette established that their weapons were holstered. Furthermore, the officers did not touch defendant at this point, and defendant felt free to decline Officer Mette's repeated request to stand up.

¶ 24 During this consensual encounter, reasonable suspicion developed, which transformed it into a lawful investigatory *Terry* stop. To justify a *Terry* stop, a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21. See also 725 ILCS 5/107-14 (West 2010) (after a peace officer identifies himself, he may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense, and may demand the name and address of the person and an explanation of his actions). When reviewing the officer's actions, a court applies an objective standard to decide whether the facts available to the officer at the time would lead an individual of reasonable caution to believe that the actions taken were appropriate. *People v. Close*, 238 Ill. 2d 497, 505 (2010). The validity of such a stop rests upon the totality of the facts and circumstances known to the officer at the time of the stop. *People v. Adams*, 225 Ill. App. 3d 815, 818 (1992).

¶ 25 The circumstances of this case establish that a continued investigation was warranted. Specifically, Officer Mette, who was investigating a complaint that drug dealers had run into the building, noticed defendant was shaking visibly. Moreover, Officer Mette asked questions which defendant voluntarily answered and learned that defendant could not state the address even though he claimed to live there and was actually 18 years old even though he claimed to be only 15. Although Officer Mette initially thought defendant could have been a minor who claimed to be waiting for his mother because he did not have a key to his apartment, Officer Mette realized that defendant was lying about his age and probably lying about his address. See 720 ILCS 5/31-4.5 (West 2010) (a person commits the Class A misdemeanor offense of obstructing identification when he intentionally or knowingly furnishes a false or fictitious name, residence address, or date of birth to a peace officer who has lawfully arrested or detained the person, or requested the information from a person the officer has good cause to believe is a witness to a criminal offense). Accordingly, Officer Mette determined that he had to detain defendant, take him outside to the patrol car, and view some photographs to establish his identity. Using an objective standard, the facts and circumstances known to the officer warranted a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity. See *People v. Walters*, 256 Ill. App. 3d 231, 234 (1994).

¶ 26 Having determined that a continued investigation was warranted, we must determine whether Officer Mette's actions of handcuffing defendant and then lifting him to his feet were justified as part of the continuing *Terry* investigation. Because *Terry* permits an officer to briefly detain an individual to investigate the possibility of criminal behavior without probable cause to arrest, the mere restraint of an individual does not turn an investigatory stop into an arrest. *People v. Young*, 306 Ill. App. 3d 350, 354 (1999). Consequently, even though a defendant is actually not free to go during the investigatory stop, the stop is not an arrest. *People v. Paskins*, 154 Ill. App. 3d 417, 422 (1987). The difference between an arrest and a *Terry* stop is not the restraint on a person's movement but, rather, depends on the length of time the person is detained and the scope of the investigation that follows the initial encounter. *Id*. "The scope of the investigation must be reasonably related to the circumstances that

justified the police interference and the investigation must last no longer than is necessary to effectuate the purpose of the stop." *People v. Ross*, 317 Ill. App. 3d 26, 31 (2000).

¶ 27    The mere act of handcuffing a person does not transform a *Terry* stop into an illegal arrest. *People v. Colyar*, 2013 IL 111835, ¶ 46. Rather, the propriety of handcuffing a person during a *Terry* stop depends on the circumstances of the case. *Id*. "It would be paradoxical to give police the authority to detain pursuant to an investigatory stop yet deny them the use of force that may be necessary to effectuate the detention." *People v. Starks*, 190 Ill. App. 3d 503, 509 (1989). Legitimate interests in using handcuffs during a *Terry* stop include protecting law enforcement officers, the public, or the suspect from the undue risk of harm. *People v. Arnold*, 394 Ill. App. 3d 63, 72 (2009).

¶ 28    Here, the record establishes that defendant was shaking, nervous and evasive, gave inconsistent answers to basic questions, and could not establish that he belonged in that building's stairwell at 2 a.m. where someone had complained to the police that drug dealers had run into that building. Furthermore, defendant would not comply with Officer Mette's requests to stand up. In order to investigate defendant's identity, the officers had to move him down three flights of stairs to the patrol car parked outside the building. This would enable the officers to compare defendant's face to any photograph the police would have connected to defendant's name. Officer Mette knew that a gang conflict was going on in the building and narcotics arrests had been made there before. After defendant refused to move, Officer Mette informed him that he would handcuff him and find out who he was. Officer Mette then handcuffed defendant and lifted him to his feet. Under the totality of the circumstances, we find that the handcuffing was reasonable in light of the circumstances that developed during the course of the stop. *Id*. at 71. The use of handcuffs was reasonably necessary for safety under these specific facts and did not transform the *Terry* stop into an arrest. Contrary to arguments raised by defendant during oral argument, it would not have been reasonable for one officer to remain with defendant while the other officer went to the patrol car to investigate defendant's identity. First, the need to compare defendant's face with photographs available to the police in their patrol car warranted the presence of defendant, who had been untruthful to the officers, at the patrol car. Second, the police were in the building investigating a complaint that drug dealers had run into the building, and the police knew that a gang conflict was going on in that building and members of the officers' team had made narcotics arrests inside that building before. Under these circumstances, it would have been foolhardy to leave one officer alone in the building while the other officer went outside to the patrol car.

¶ 29    Furthermore, defendant's detention was reasonable in length and scope. The purpose of the stop was to allow the officer to investigate the circumstances that provoked suspicion and either confirm or dispel his suspicions. Officer Mette intended to walk defendant down the stairwell and outside to the patrol car and establish his identity by viewing photographs. The patrol car was parked outside the building and, thus, within the vicinity of the lawful *Terry* stop. Furthermore, defendant refused to stand up, and the use of handcuffs before Officer Mette lifted defendant to his feet was for the safety of defendant and the officers while they investigated the circumstances and ascertained defendant's identity. Moreover, the record is clear that Officer Mette did not frisk defendant before handcuffing him and lifting him to his feet. *Cf. People v. Sims*, 2014 IL App (1st) 121306, ¶ 13 (the officer's stop *and frisk* of the defendant was not justified under *Terry* where the officer, who never testified that he saw a weapon or other contraband, suspected the defendant of unlawful possession of a weapon but

only saw him place an unknown object down the front of his pants and walk away). After defendant was lifted to his feet in order to take him to the patrol car, he dropped his gun and provided probable cause for his arrest. We conclude that the trial court properly denied defendant's motion to quash arrest and suppress evidence, and his gun and statement admitting possession thereof were properly admitted into evidence.

¶ 30                          B. Proof of Defendant as an Invitee

¶ 31    Defendant argues the State failed to prove his guilt of AUUW beyond a reasonable doubt because the State did not present any evidence that defendant was not an invitee of a resident of the apartment building where he was arrested.

¶ 32    The State responds that it was defendant's burden to raise and prove the invitee exception of the AUUW offense and the evidence here established that defendant was proven guilty beyond a reasonable doubt of AUUW. Alternatively, the State argues defendant's conviction should be affirmed because the evidence supported a reasonable inference that he was not an invitee with permission to carry a firearm.

¶ 33    In this case, defendant was charged and found guilty of knowingly carrying a handgun while not on his own land or in his own abode or fixed place of business and for being under the age of 21 at the time he was in possession of the handgun, pursuant to section 24-1.6(a)(1), (a)(3)(I) of the Criminal Code of 1961 (Code) (720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2008) (hereinafter, the under 21 subsection)).

¶ 34    The under 21 subsection of the AUUW statute in effect at the time of defendant's July 2012 offense provided in part:

> "(a) A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:
>
> (1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, *or on the land or in the legal dwelling of another person as an invitee with that person's permission*, any pistol, revolver, stun gun or taser or other firearm; [and]
> ***
> (3) One of the following factors is present:
> * * *
> (I) the person possessing the weapon was under 21 years of age and in possession of a handgun as defined in Section 24-3, unless the person under 21 is engaged in lawful activities under the Wildlife Code or described in subsection 24-2(b)(1), (b)(3), or 24-2(f)." (Emphasis added.) 720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2010).

Public Act 96-742, which became effective August 25, 2009, added the above-italicized invitee provision in subsection 24-1.6(a)(1), which defendant cites as the basis to reverse his conviction.

¶ 35    Also relevant to our analysis is section 24-2 of the Code (720 ILCS 5/24-2 (West 2010)), which lists exemptions that apply to certain provisions of the AUUW statute and the unlawful use of weapons statute (UUW) (720 ILCS 5/24-1 (West 2010)). (The UUW statute is not an issue in this appeal.) When Public Act 96-742 added the invitee provision to the AUUW

statute, it also added the invitee provision to the listed exemptions in section 24-2 of the Code (720 ILCS 5/24-2 (West 2008)). Accordingly, section 24-2(b)(5) of the Code provides, in pertinent part, that the AUUW statute does not apply to or affect:

> "(5) Carrying or possessing any pistol, revolver, stun gun or taser or other firearm on the land or in the legal dwelling of another person as an invitee with that person's permission." 720 ILCS 5/24-2(b)(5) (West 2010).

However, section 24-2(h) of the Code states:

> "(h) An information or indictment based upon a violation of any subsection of this Article need not negative any exemptions contained in this Article. *The defendant shall have the burden of proving such an exemption*." (Emphasis added.) 720 ILCS 5/24-2(h) (West 2010).

¶ 36    A reviewing court's primary objective in construing a statute is to ascertain and give effect to the legislative intent, and the surest and most reliable indicator of that intent is the plain and ordinary meaning of the statutory language itself. *People v. Chapman*, 2012 IL 111896, ¶ 23. Where the language is clear and unambiguous, this court will apply the statute without further aids of statutory construction. *Id*. Statutes should be read as a whole and construed so that no part is rendered meaningless or superfluous. *People v. Lloyd*, 2013 IL 113510, ¶ 25.

¶ 37    The plain language of sections 24-2(b)(5) and 24-2(h) of the Code establishes that the General Assembly intended the defendant to bear the burden of proving by a preponderance of the evidence his entitlement to the invitee exemption. See also *People v. Velez*, 336 Ill. App. 3d 261, 266 (2003) (defendant bears the burden of proving by a preponderance of the evidence his entitlement to an exemption from criminal liability for UUW by reason of the weapon at issue being broken down in a nonfunctioning state or not immediately accessible); accord *People v. Martinez*, 285 Ill. App. 3d 881, 884 (1996).

¶ 38    In *People v. Smith*, 71 Ill. 2d 95, 109 (1978), the court held that in a prosecution for UUW, "it was proper to instruct the jury that the burden of proving, by a preponderance of the evidence, that the defendant came within an exemption to the statute was upon him. The burden of proving each element of the crime is always upon the State and remains so thoughout [*sic*] the proceedings." Further, the court noted that when the legislature added 10 separately enumerated exempt categories to subsection 24-1(a)(10) of the UUW statute (Ill. Rev. Stat. 1973, ch. 38, ¶¶ 24-2(a), (b)), the legislature avoided saddling the State with the impossible burden of negating each of the 10 exempt categories by requiring the State to prove each and every element of the offense beyond a reasonable doubt and requiring the defendant to prove his entitlement to the exemption. *Smith*, 71 Ill. 2d at 105. The court explained as follows:

> "That such exemptions are distinct from affirmative defenses under our statutory scheme and never become an issue for the State to prove is shown by the provisions of the Criminal Code of 1961 [citation]. The Code defines an affirmative defense and provides that, once the issue is raised, the burden is on the State to prove that issue, together with all other elements of the offense, beyond a reasonable doubt. [Citation.] To the contrary, the State need never negate any exemption. [Citation.] Substantially similar treatment of exemptions is found in the Cannabis Control Act [citation] and the Illinois Controlled Substances Act [citation].
>
> Whenever the legislature intends a provision to constitute an affirmative defense to a crime it has labeled it as such. Illustrative are the affirmative defenses to such crimes

as indecent liberties with a child [citation], bigamy [citation], disseminating obscene material [citation], disseminating harmful material to a child [citation], unlawful use of recorded sounds [citation], unlawful restraint [citation], and criminal defamation [citation].

Had the legislature intended to treat these exemptions as affirmative defenses, it would have labeled them as such." *Id.* at 105-06.

¶ 39    The rationale in *Smith* is applicable in the instant case involving the AUUW statute. Further support for the correctness of the rationale in *Smith* is seen by the interaction of section 111-3(a)(3) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(a)(3) (West 2010)) with section 24-2(h) of the Code (720 ILCS 5/24-2(h) (West 2010)). Whereas section 111-3(a)(3) requires the State to set forth the elements of the offense in the charging instrument, section 24-2(h) expressly relieves the State from mentioning the absence of the exemptions of section 24-2 in the charging instrument.

¶ 40    The applicable rule to determine whether an exception constitutes an additional element of an offense is well established:

" '[I]t is the rule in this State that where an act is made criminal, with exceptions embraced in the enacting clause creating the offense, so as to be descriptive of it, the People must allege and prove that the defendant is not within the exceptions so as to show that the precise crime has been committed. In other words, where the exception is descriptive of the offense it must be negatived in order to charge the defendant with the offense. On the other hand, if the exception, instead of being a part of the description of the offense, merely withdraws certain acts or certain persons from the operation of the statute it need not be negatived, and its position in the act, whether in the same section or another part of the act, is of no consequence. [Citations.]' " *People v. Close*, 238 Ill. 2d 497, 508 (2010) (quoting *People ex rel. Courtney v. Prystalski*, 358 Ill. 198, 203-04 (1934)).

Accord *People v. Green*, 362 Ill. 171, 175-76 (1935); *People v. Handzik*, 410 Ill. 295, 306 (1951); *People v. Laubscher*, 183 Ill. 2d 330, 335 (1998).

¶ 41    Applying this rule, the invitee exemption merely withdraws persons with permission from the inviter of the land or dwelling from the operation of the statute and, thus, is not descriptive of the offense. The invitee exemption is not part of the substantive offense of AUUW, so we reject defendant's argument that the State must prove that he was not an invitee. Because the commission of the AUUW crime does not depend on the inapplicability of the invitee exception, the invitee exemption does not bear on the elements of the AUUW offense; instead, it states only that particular defendants (those who are invitees on the land or in the legal dwelling of another person with that person's permission to carry the firearm) are protected from liability. Because the exemption merely withdraws certain persons from the scope of the statute, the State has no burden to disprove it. We agree with the State that the invitee exemption is not an element of the offense of AUUW.

¶ 42    Defendant, however, cites *People v. Brisco*, 2012 IL App (1st) 101612, ¶ 16, for the proposition that the invitee exemption was "a necessary element of the offense of AUUW after August 25, 2009." We do not find *Brisco* persuasive because it stated that proposition without any analysis or discussion of sections 24-2(b)(5) and 24-2(h). Furthermore, the State in *Brisco* had conceded, unlike the State here, that it was required to prove the defendant was not an invitee as an element of the offense of AUUW. *Id.* ¶ 22. In any event, *Brisco* rejected the

defendant's alternative argument challenging the sufficiency of the State's evidence concerning defendant's status as an invitee where the evidence showed that the defendant possessed the rifle on the street before he ran inside the building and dropped it, was found crouched behind some boxes in a basement apartment, and did not know the last name of his friend of over two years with whom he was allegedly staying that evening. *Id.* ¶ 28.

¶ 43 Defendant also cites *Laubscher*, 183 Ill. 2d 330, to support his argument that the State has the burden of disproving the invitee exemption as an element of the offense. In *Laubscher*, the court reversed the defendant's UUW conviction because the State failed to prove that at the time the defendant possessed the weapon, he was not either "on his land" or in his "fixed place of business" as provided in the exceptions to the UUW statute. *Id.* at 335 (citing 720 ILCS 5/24-1(a)(4) (West 1994)). The court explained that "[w]hen an exception appears as part of the body of a substantive offense, the State bears the burden of disproving the existence of the exception beyond a reasonable doubt." *Id.* According to defendant, the invitee provision in the AUUW statute is just like the "on his land" exception at issue in *Laubscher* because the invitee provision is in the body of the statute defining the offense. Defendant contends that, while section 24-2(b)(5) also allows the defendant to raise his invitee status as an affirmative defense to the AUUW statute, that does not change the fact that the legislature also placed this exception in the body of the AUUW statute and in the same sentence containing the exception that *Laubscher* held must be disproved by the State.

¶ 44 We disagree. *Laubscher* is inapposite because it did not involve a statutory exemption listed in section 24-2 but, rather, a statutory exception found only in the statute defining the offense.

¶ 45 Defendant had the burden of proving, by a preponderance of the evidence, that he came within the invitee exemption of the AUUW statute, and we find that he did not meet that burden. Defendant merely testified that he found the gun outside, wanted to put it up in the apartment where he sometimes stayed with his uncle, and was waiting in the stairwell for his mother. The officer testified that he and his partner were investigating a complaint that drug dealers had run into the building upon the arrival of the police, and the only person they saw inside the building was defendant sitting alone on the third-floor landing. Although defendant claimed to live there, he did not have a key and did not know the address. Defendant presented no facts to indicate that he had anyone's permission to be on the premises carrying a firearm.

¶ 46 C. Constitutionality of the AUUW Statute

¶ 47 Defendant challenges the constitutionality of the under 21 subsection of the AUUW statute under which he was convicted. 720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2010). Defendant argues the under 21 subsection is facially unconstitutional because it is a blanket prohibition on handgun possession by a certain subset of law-abiding adults. Citing *People v. Aguilar*, 2013 IL 112116, ¶ 19, defendant argues the under 21 subsection is an unreasonable restriction on an 18-to-20-year-old adult's right to defend himself in public. Defendant argues that, as an 18-year-old at the time of the offense, he is a member of the political community protected by the second amendment because he possesses the constitutional right to vote and, thus, has an individual right to keep and bear arms for self-defense outside the home.

¶ 48 Whether a statute is constitutional is a question of law to be reviewed *de novo*. *People v. Sharpe*, 216 Ill. 2d 481, 486-87 (2005). Statutes are presumed constitutional, and we have a duty to construe the statute in a manner that upholds its validity and constitutionality if it can

be reasonably done. *Aguilar*, 2013 IL 112116, ¶ 15. The party challenging the constitutionality of a statute carries the burden of proving that the statute is unconstitutional. *Id.*

¶ 49                                  1. The Right to Keep and Bear Arms

¶ 50    In *Aguilar*, the Illinois Supreme Court found that the Class 4 form of section 24-1.6(a)(1), (a)(3)(A), (d) of the Code (720 ILCS 5/24-1.6(a)(1), (a)(3)(A), (d) (West 2008)), which made it unlawful for a person to possess an uncased, loaded and immediately accessible firearm except when the person was on his land or in his abode or fixed place of business, was a comprehensive ban, rather than a reasonable regulation, of the right to possess and use an operable firearm for self-defense outside the home. *Aguilar*, 2013 IL 112116, ¶ 21. Accordingly, the court concluded that subsection (a)(3)(A) of the AUUW statute was facially unconstitutional because it violated the second amendment. *Id.* ¶ 22.

¶ 51    Although the court reversed the defendant's AUUW conviction under subsection (a)(3)(A) of the AUUW statute, it upheld his separate conviction for unlawful possession of a firearm based on his age–17 years old at the time of the offense–and the long-standing prohibition against the possession of handguns by minors. *Id.* ¶¶ 26-27. In reaching that conclusion, the court followed the reasoning in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which confirmed that the right to keep and bear arms was subject to long-standing prohibitions on the possession of firearms by felons and the mentally ill, and to laws forbidding the carrying of firearms in sensitive places like schools and government buildings, and laws imposing conditions and qualifications on the commercial sale of firearms. *Aguilar*, 2013 IL 112116, ¶¶ 26-27; *Heller*, 554 U.S. at 626-27. In upholding a law-abiding citizen's right to possess an operable handgun "in defense of hearth and home," the Supreme Court stated that the second amendment's guarantee of an individual right to possess and carry weapons in case of confrontation, like the first amendment's right of free speech, was not unlimited. *Heller*, 554 U.S. at 592, 595, 635. The Supreme Court did "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation." (Emphasis in original.) *Id.* at 595. The right to keep and bear arms was not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

¶ 52                          2. The Under 21 Subsection of the AUUW Statute

¶ 53    Here, we address defendant's AUUW conviction under a different section of the statute than *Aguilar* addressed. Whereas *Aguilar* struck subsection (a)(1), (a)(3)(A) as unconstitutional, defendant challenges the under 21 subsection.

¶ 54    Defendant argues the under 21 subsection of the AUUW statute unconstitutionally disarms adults who are 18 to 20 years old. Defendant argues these young adults are members of the political community protected by the second amendment. While defendant recognizes that the second amendment upholds a law-abiding citizen's right to keep and bear arms and has been subject to long-standing categorical prohibitions on the possession of firearms, such as possession by felons and the mentally ill or the carrying of firearms in sensitive places, defendant contends 18- , 19- , and 20-year-old adults are part of the virtuous citizenry and cannot be categorically disarmed like convicted felons, children, or the mentally ill.

¶ 55    We disagree. The consensus among historians and jurists is that "the People" referenced in the second amendment were limited to the "virtuous citizenry." See *United States v. Yancey*,

- 12 -

621 F.3d 681, 684-85 (7th Cir. 2010). In *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012), the Seventh Circuit acknowledged that a state law restricting an individual's second amendment right to bear arms may "prevail *** when *** guns are forbidden to a class of persons who present a higher than average risk of misusing a gun." Furthermore, the *Aguilar* court emphasized the limitation of its holding, stating that the right to possess and use a firearm for self-defense outside the home was not unlimited or exempt from meaningful regulation. *Aguilar*, 2013 IL 112116, ¶ 21.

¶ 56    In *People v. Henderson*, 2013 IL App (1st) 113294, this court considered the constitutionality of the section of the AUUW statute prohibiting possession of a firearm without a FOID card (720 ILCS 5/24-1.6(a)(2), (a)(3)(C) (West 2010)), and the defendant's claim that the FOID card requirement, without any individualized determination of dangerousness, completely barred all persons under 21 years old from firearm ownership without parental permission. This court concluded that the FOID card provision concerning people under 21 years of age was a constitutional restriction on the possession of firearms. *Henderson*, 2013 IL App (1st) 113294, ¶¶ 30-33. Specifically, this court noted cases from other jurisdictions involving the prohibition of the purchase and possession of handguns by persons less than 21 years of age and concluded that the under-21-years-of-age prohibition was historically rooted and did not affect conduct at the core of the second amendment right. *Id.* ¶ 30. We agree with the conclusion reached in *Henderson*.

¶ 57    The core protection of the second amendment is the "right of law-abiding, *responsible* citizens to use arms in defense of hearth and home." (Emphasis added.) *Heller*, 554 U.S. at 635. Although the second amendment guaranty has *some* application in the very different context of possession of firearms in public, "outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011). "The Second Amendment does not foreclose regulatory measures to a degree that would result in 'handcuffing lawmakers' ability to prevent armed mayhem in public places.' " *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (2d Cir. 2010) (quoting *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011)).

¶ 58    Neither *Heller* nor *Aguilar* sets forth an analytical framework to evaluate the regulation of the public carriage of firearms; however, a two-part approach to second amendment claims has emerged as the prevailing analysis. *Wilson v. County of Cook*, 2012 IL 112026, ¶¶ 41-42. First, the court conducts a textual and historical inquiry to determine whether the challenged law imposes a burden on conduct that was understood to be within the scope of the second amendment's protection at the time of ratification. *Id.* ¶ 41. The regulated activity is categorically unprotected if the challenged law regulates activity falling outside the scope of the second amendment right. *Id.* However, if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected, then the court, applying the appropriate level of means-ends scrutiny, conducts a second inquiry into the strength of the government's justification for restricting or regulating the exercise of second amendment rights. *Id.* ¶ 42; *Ezell v. City of Chicago*, 651 F.3d 684, 701-04 (7th Cir. 2011). *Heller* rejected rational-basis review and requires some form of heightened scrutiny. *Heller*, 554 U.S. at 628 n.27.

¶ 59    The conduct at issue here–possession in public of a handgun by an 18-to-20-year-old adult who may be a law-abiding citizen carrying the handgun for the purpose of self-defense–is not

- 13 -

at the core of the right to bear arms like the defense of hearth and home. Nevertheless, this conduct is not completely beyond the scope of the second amendment's protection. Because the challenged under 21 subsection burdens conduct within the scope of the second amendment guarantee, we evaluate the prohibition under the appropriate standard of constitutional scrutiny. Second amendment challenges, like first amendment challenges, can trigger more than one particular standard of scrutiny. The first amendment right to free speech is an enumerated fundamental right, yet it is subject to several standards of scrutiny depending on the type of speech and level of prohibition at issue. See *United States v. Marzzarella*, 614 F.3d 85, 96-98 (3d Cir. 2010) (discussing the application of intermediate scrutiny to content-neutral time, place and manner restrictions, or to regulations on nonmisleading commercial speech). Whereas a regulation that threatens a right at the core of the second amendment triggers strict scrutiny, a less severe regulation requires a less demanding means-end showing. *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012). Intermediate scrutiny requires the government to demonstrate that the regulation is reasonably adapted to a substantial governmental interest. *Id.*

¶ 60    Here, the challenged under 21 subsection does not constitute a total ban on conduct that is at the core of the second amendment right, such as the total ban in *Heller* on having an operable handgun in one's home for the lawful purpose of self-defense. Furthermore, this court has rejected the contention that the public carriage of handguns by those under 21 is conduct at the core of the second amendment right. See *Henderson*, 2013 IL App (1st) 113294, ¶ 30 (citing *National Rifle Ass'n of America, Inc.*, 700 F.3d at 204 (finding restrictions on the ability of persons under 21 to purchase handguns to be firmly historically rooted), *United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (the right to keep arms in the founding period did not extend to juveniles), and *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387-90 (D. Mass. 2013) (a Massachusetts law that proscribed the carrying of firearms by persons under the age of 21 did not violate the second amendment)); see also *Baril v. Baril*, 354 A.2d 392, 396 (Me. 1976) (stating that the "English common law doctrine of majority of twenty-one years [was] recognized and enforced by the colonists"); *National Rifle Ass'n of America, Inc.*, 700 F.3d at 201 (noting that the age of majority at common law was 21, and it was not until the 1970s that states enacted legislation to lower the age of majority to 18); *United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (statutory categorical disqualifications on the possession of firearms by some persons are permissible and do not need to "mirror limits that were on the books in 1791"). In addition, the severity of the age disqualification is reduced by its temporary nature; the burdened 18-to-20-year-old adults will soon grow up and out of its reach. *National Rifle Ass'n of America, Inc.*, 700 F.3d at 207. Consequently, intermediate scrutiny is the appropriate level of heightened scrutiny to apply here based upon the type of protected conduct that is burdened and the severity of the restriction that is challenged. To survive intermediate scrutiny, the fit between the challenged regulation and the asserted governmental objective need only be reasonable, "not perfect." *Marzzarella*, 614 F.3d at 98.

¶ 61    First, we consider whether the under 21 subsection serves a significant, substantial or important government interest. Promoting and ensuring the safety of both the general public and police officers by limiting the accessibility of firearms in public to a less responsible or less mature group of people constitutes a substantial or important interest. See *People v. Ross*, 407 Ill. App. 3d 931, 942 (2011) (the government has an inherent and lawful power of restraint

- 14 -

upon private rights as necessary and appropriate to promote society's health, comfort, safety and welfare even though the prohibitions invade an individual's right of liberty). In *People v. Marin*, 342 Ill. App. 3d 716, 723-24 (2003), this court looked at the history and language of the AUUW statute and determined that its purpose was to protect the public and police officers from the inherent dangers and threats to safety posed by any person carrying in public a loaded and immediately accessible firearm on his person or in his vehicle. In particular, the statute intended to "prevent situations where no criminal intent existed, but criminal conduct resulted despite the lack of intent, *e.g.*, accidents with loaded guns on public streets or the escalation of minor public altercations into gun battles or \*\*\* the danger of a police officer stopping a car with a loaded weapon on the passenger seat." *Id*. at 727. Even innocent motivations could be transformed "into culpable conduct because of the accessibility of weapons as an outlet for subsequently kindled aggression." *Id*. Comments made during the legislative debates indicate that the legislature recognized that it was treating adults under 21 years of age differently in order to "recognize the activity of gang members or young kids in certain parts of the state that are active in gangs" and address the concern that gang members should be one of the groups targeted by this legislation. 91st Ill. Gen. Assem., House Proceedings, April 10, 2000, at 54-55 (statements of Representative Cross).

¶ 62 We conclude from that discussion that the legislature sought to deter 18-to-20-year-old adults from carrying handguns, which threaten both the public and police officers, because the 18-to-20-year-old group is heavily at risk for illegal gang-related activity. See *Kachalsky*, 701 F.3d at 97 (citing *Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 665 (1994), to support the proposition that deference is warranted to the predictive judgments of the legislature, which is far better equipped than the judiciary to make sensitive public policy judgments–within constitutional limits–concerning the dangers in carrying firearms and the manner to combat those risks). We also note that the 18-to-20-year-old age group is more likely to be directly interacting with and, thus, endangering juveniles under 18 years of age. We find that the under 21 subsection serves a substantial and important government interest to reduce in this state the armed violence and illegal activity of street gangs and others by preventing those under 21 years of age from carrying handguns in public, except in certain limited circumstances involving lawful hunting, target shooting, employment or military service. See 520 ILCS 5/1.1 *et seq.* (West 2010); 720 ILCS 5/24-2(b)(1), (f) (West 2010); 720 ILCS 5/24-2(b)(3) (West 2010).

¶ 63 We also find that the fit between the under 21 subsection and the substantial and important government goal is absolutely reasonable although arguably somewhat imperfect. A reasonable fit "represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served.' " *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 480 (1989) (quoting *In re R.M.J.*, 455 U.S. 191, 203 (1982)). The argument that the 18-to-20-year-old group is not unusually dangerous is not persuasive given the statistics concerning the use of handguns among that group in matters involving illegal street gang activity and other crimes.

¶ 64 As discussed above, the purpose of the challenged provision is to advance public and police officer safety by eliminating the inherent threats posed by young adults carrying handguns in public. Because we find that the fit between the challenged under 21 subsection of the AUUW statute and the statute's substantial and important goal is absolutely reasonable, the

- 15 -

under 21 subsection does not violate the second amendment and defendant's AUUW conviction must stand.

¶ 65                                    III. CONCLUSION

¶ 66        In light of the forgoing, we affirm the judgment of the circuit court of Cook County.

¶ 67        Affirmed.

¶ 68        JUSTICE HALL dissenting.

¶ 69        I respectfully dissent. I agree a police officer may pose questions to a person without turning the encounter into a seizure. See *People v. Luedemann*, 222 Ill. 2d 530, 551 (2006) ("It is well settled that a seizure does not occur simply because a law enforcement officer approaches an individual and puts questions to that person if he or she is willing to listen."). In the instant case, the police officers' initial approach and questioning of defendant was consensual. However, this consensual encounter escalated into a seizure for purposes of the fourth amendment when defendant was handcuffed and lifted to his feet. See *People v. Lopez*, 229 Ill. 2d 322, 345-46 (2008) (for purposes of the fourth amendment, a seizure occurs when, by means of physical force or a show of authority, a person's freedom of movement is restrained); *People v. Conner*, 358 Ill. App. 3d 945, 949 (2005) (defendant was seized within meaning of fourth amendment where he was detained and handcuffed). Therefore, the issue becomes whether defendant's seizure was lawful, *i.e.*, was it supported by a reasonable, articulable suspicion he was engaged in criminal activity. This determination is based upon the totality of the circumstances. *People v. Chestnut*, 398 Ill. App. 3d 1043, 1051 (2010).

¶ 70        I believe that under the totality of the circumstances, defendant's conduct did not give rise to a reasonable, articulable suspicion he was engaged in criminal activity. The majority concludes police officers had a reasonable suspicion defendant was engaged in criminal activity because he was visibly shaking, gave inconsistent answers to basic questions, could not establish he belonged in the building's stairwell at 2 a.m., and refused to comply with the officer's request to stand up. I disagree.

¶ 71        The fact that defendant was nervous and visibly shaking when he was questioned by the police is not particularly indicative of criminal conduct. See *Chestnut*, 398 Ill. App. 3d at 1052 (nervousness not always indicative of criminal conduct). Moreover, the fact that defendant gave evasive answers, could not establish he belonged in the building's stairwell at 2 a.m., and refused to comply with the officer's request to stand up does not, without more, demonstrate he was committing or was about to commit some criminal activity. "Acts that are essentially neutral or ambiguous do not become specifically criminal in character because they occur in a high crime area. *** In order to detain an individual to investigate for crime, some nexus between the individual and specific criminal conduct must reasonably exist and must be articulated by the officer." (Internal quotation marks omitted.) *State v. Ferrante*, 196 Ohio App. 3d 113, 2011-Ohio-4870, 962 N.E.2d 383, at ¶ 26. Furthermore, an individual's presence in or near an area of expected criminal activity, standing alone, is not enough to support a reasonable suspicion that the person is committing a crime. *People v. Elliot*, 314 Ill. App. 3d 187, 192 (2000).

¶ 72        In sum, the totality of the circumstances is not sufficient as a matter of law to give rise to a reasonable suspicion that defendant was engaged in criminal activity. As a result, I believe evidence of the firearm should have been suppressed as the product of an unlawful seizure.