# Illinois Official Reports

## Appellate Court

---

### *People v. Thornton*, 2020 IL App (1st) 170753

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES E. THORNTON, Defendant-Appellant. |
| District & No. | First District, Second Division<br>No. 1-17-0753 |
| Filed | March 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-14345; the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Maggie A. Heim, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Daniel Piwowarczyk, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion.<br>Justice Coghlan concurred in the judgment and opinion.<br>Justice Pucinski specially concurred, with opinion. |

**OPINION**

¶ 1      Following a jury trial, defendant Charles Thornton was found guilty of home invasion and the aggravated criminal sexual assault of victims D.P. and S.F. He was sentenced to a total term of 72 years' imprisonment for the offenses. On appeal, defendant contends that the trial court erred in denying his motion to suppress evidence, including incriminating statements, collected while he was in police custody. As justification for his claim, defendant maintains police arrested him based on an anonymous, uncorroborated tip absent reasonable suspicion or probable cause. Defendant also maintains police arrested him based on an unconstitutional investigative alert, rather than a warrant. He argues alternatively that the investigative alert was not supported by probable cause, which he claims also justifies suppression of the evidence. We affirm.

¶ 2                                             BACKGROUND
¶ 3                        *Defendant's Arrest and Motion-to-Suppress Hearing*
¶ 4      Defendant was arrested and charged with invading the home of 57-year-old D.P. and then brutally beating and raping both her and her 63-year-old friend S.F. on the Sunday morning of July 11, 2010, just before the ladies' planned church outing.

¶ 5      That same day,[1] the rape victims provided Detective Kenneth Wiggins with a physical description of defendant as a black male, between 5'7" and 5'8", and around 150 to 160 pounds. According to them, he also had a chipped front tooth and tattoos on both his upper arms. Based on this description, Detective Wiggins created a five-person photo array containing similarly described individuals, although the array unwittingly did not contain defendant's image. Detective Wiggins presented the photo array to the victims on July 13, 2010. D.P. was unable to identify her attacker from that array, while S.F. identified an individual who was clearly not defendant since his photo was not part of the array.

¶ 6      As discussed in more depth later, during the course of the rapes, defendant informed the victims that he had been shot in the mouth or face, resulting in his chipped tooth. S.F. relayed this detail to the police and her son, M.F. M.F. then conducted his own investigation in the neighborhood in search of someone who had been shot in the mouth. M.F.'s search uncovered defendant's name, which M.F. promptly relayed to Detective Wiggins on the evening of July 13. Detective Wiggins pulled defendant's physical characteristics, which matched the descriptions provided by the victims.

¶ 7      As a result, on July 14, Detective Wiggins put together another five-person photo array, this time including defendant's image. From that array, S.F. tentatively identified defendant, meaning that, while she was not completely sure he was her attacker, the photo certainly looked like him. D.P. again did not identify anyone. Defendant, it was discovered, had a previously listed address of 6100 S. Sangamon Street, only a block or so from D.P.'s house, where the rapes were committed. In addition, it was learned that defendant had indeed been shot in the mouth, having been the victim of an aggravated battery with a firearm, and had tattoos on both

_____

[1]Detective Wiggins testified at the motion-to-suppress hearing that he interviewed the sexual assault victims on July 11, 2010. However, at trial, he testified that he was assigned the case on July 13, 2010.

his upper arms. Consequently, that same day Detective Wiggins issued an investigative alert for defendant that included his photo. Detective Wiggins testified that "there was no need for a warrant" given that he had issued the investigative alert first.

¶ 8 Several days later, in the early morning hours of July 19, Chicago police officer Len Jarvis received an anonymous 911 call,[2] transmitted over the police radio, as he was working patrol. The call reported a person wanted for two criminal sexual assaults was sitting on the porch of 1000 W. 61st Street and wearing a green and white shirt and also green shorts. Officer Jarvis arrived at the address and saw that defendant (who bore that description "to the T") was the only one walking on the street. Defendant ultimately turned into a yard at 945 W. 61st Street, and Officer Jarvis later identified defendant in court as the person he observed walking down the street that evening. Although Officer Jarvis did not specifically testify to the exact length of time between the 911 call and his observation of defendant, his testimony indicates it was a very short period, as he stated the call "came out *** that somebody was wanted matching [the defendant's] description in that vicinity. We were touring that area and [the defendant was] right there."

¶ 9 Officer Jarvis and his partner then approached defendant and inquired as to his name, which defendant provided. Officer Jarvis handcuffed defendant for safety reasons, then stated defendant was not under arrest but they wished to run his name in the police system. Officer Jarvis stated that, assuming there were no problems, defendant would be "on [his] way." Defendant sat in the back of the open-door police wagon for several minutes along with the other police officer while Officer Jarvis ran defendant's name through the I-CLEAR investigative alert system. On doing so, the investigative alert, together with the attached photo, emerged that defendant was wanted for two criminal sexual assaults. The alert also contained defendant's height, weight, and fact that he had tattoos, among other details. Finding probable cause based on the investigative alert, Officer Jarvis placed defendant under arrest and Mirandized him. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Officer Jarvis indicated that the entire interaction with defendant lasted only several minutes.

¶ 10 Relevant to this appeal, defendant, while acting *pro se*, filed a motion to quash his arrest and suppress evidence. Testimony reflected the above-stated facts,[3] with defendant calling as his witness Officer Jarvis and the State calling Detective Wiggins to testify. Defendant argued there was no probable cause for his arrest. He noted that Detective Wiggins issued an investigative alert instead of obtaining a warrant, yet this bypassed the constitutional requirement that a warrant be issued based on probable cause and supported by an affidavit. Defendant was subsequently represented by counsel,[4] who added that defendant was illegally

---

[2]Officer Jarvis specifically testified that he received the call through the "OEMC," which is the Office of Emergency Management and Communications and provides Chicagoans with a 911 service for police, fire, and emergency medical services.

[3]Some of the facts are also derived from Officer Jarvis's testimony at a separate hearing on defendant's motion-to-suppress statements, wherein defendant was represented by counsel. Both parties cite this testimony, which is appropriate since a reviewing court may consider all trial evidence in determining whether the trial court's decision denying a motion to suppress was correct. *People v. Murdock*, 2012 IL 112362, ¶ 35.

[4]After defendant represented himself *pro se* at the hearing on his motion to suppress evidence and after the court denied the motion, a public defender was assigned to defendant's case. The public defender then filed a motion to reconsider on defendant's behalf, and the parties presented extensive

arrested at the outset by Officer Jarvis based on a phone call from an anonymous, unreliable informant, who provided insufficient information for the arrest. Counsel further argued that the investigative alert did not give rise to probable cause to arrest.

¶ 11 The State responded that probable cause existed and was sufficient to support defendant's arrest in this case. The State argued that Officer Jarvis was justified in asking for defendant's name and also had probable cause at the time he arrested defendant based on the investigative alert. The State noted that Detective Wiggins testified as to his personal knowledge of probable cause underlying the investigative alert. The facts showed that Detective Wiggins was given defendant's name as a possible suspect and, upon investigation, learned that defendant bore the same tattoos and facial injuries as described by the victims. In addition, one of the victims tentatively identified him as the suspect from the photo array, and he lived near one of them. All this justified a warrantless arrest since there was probable cause for the arrest. The trial court agreed with the State and denied defendant's motion.

¶ 12 *Defendant's Trial and Sentencing*

¶ 13 The cause then proceeded to trial, where evidence established that on the Sunday morning of July 11, 2010, D.P. was waiting for her friend S.F. to pick her up for church from D.P.'s home at 6040 S. Sangamon Street in Chicago. D.P. suffered from seizures and could no longer drive.

¶ 14 The doorbell rang. Thinking it was a neighbor, D.P. opened the door only to find a black man she did not recognize before her, who immediately pushed his way into her home while hitting her. The man, later identified as defendant, pushed her on the floor and took off her clothes. D.P. fought him but to no avail. He pulled her into the bedroom while continuing to take off her clothing and hit her, then attempted to have sex with her.

¶ 15 Meanwhile S.F. had arrived at the home around 7:30 a.m. On approaching the door, she saw one of D.P.'s shoes and her glasses in the vestibule. Believing that D.P. might be having a seizure, S.F. entered the apartment to the dining room, whereupon a naked man "jumped out," then beat her over the head, kicked her, knocked her down, and pulled on her clothes. Defendant stated, "bitch, you shouldn't had come in here, but I'm glad you did." Defendant then beat S.F. in the head and face with a silver metal ashtray and pulled her down to the floor as she struggled against him. Defendant pulled off S.F.'s pantyhose, twisted her arm back, and dragged her into the bedroom. D.P. was crouched naked in the corner, beaten down, and appeared unable to get up, according to S.F. Defendant took off S.F.'s clothing and placed both women on the bed. He vaginally raped D.P. from behind, stating, "[Y]ou're going to like this. Old ladies need this. Nobody fucks old ladies." He raped S.F. while facing her. D.P. then started having a seizure. Defendant moved back to D.P., vaginally raped her again, and ordered her to perform fellatio. Defendant returned to S.F. and anally raped her. The alternating rapes continued.

¶ 16 D.P. had yet another seizure, prompting S.F. to plead with defendant to obtain water and medication, which he allowed. Defendant followed S.F. into the kitchen, S.F. obtained water

oral argument before the trial court. For the ease of readers, we have simply collapsed the arguments together above. The court denied defendant's motion to reconsider and his motion for a new evidentiary hearing, both of which were filed with the aid of counsel. For defendant's jury trial, the court ultimately appointed him a private attorney.

and brought it back to D.P., and D.P. took her pills. D.P. tried to run out of the apartment for help, but defendant beat her and brought her back into the bedroom.

¶ 17    S.F., in an attempt to abate the beatings, began asking defendant questions and urging him to stop. S.F. looked at him more closely and noticed his teeth were chipped, then inquired how that happened. Defendant informed her that he had been shot in the mouth and that the bullet struck his neck. S.F. tried to coax defendant to leave. Defendant eventually told S.F. that she looked like a "Christian lady" and asked her to pray for him. Everyone got clothed, and they prayed together. S.F. then suggested that defendant leave while assuring him they would not call the police. Defendant eventually left.

¶ 18    The police were subsequently called. S.F. and D.P. were transported to the hospital, where sexual assault kits were collected. Defendant's DNA was a match to that recovered from D.P. and S.F. as part of the sexual assault kit, and his fingerprints were found on the metal ashtray police recovered from D.P.'s home.

¶ 19    As intimated above, defendant was placed in police custody and then in a lineup on July 19, where both S.F. and D.P. identified him as their attacker. He was subsequently interviewed by the assistant state's attorney and ultimately admitted via a written statement to beating and sexually assaulting both women, which was consistent with their in-court testimony. S.F. and D.P. also identified defendant in court as their attacker.

¶ 20    The jury found defendant guilty as charged, and he was sentenced to 10 years for home invasion (count I), two 16-year terms for the aggravated criminal sexual assault of S.F. (counts VI and VII), and three 10-year terms for the aggravated criminal sexual assault of D.P. (counts IX, X, and XII), all to be served consecutively for a total prison term of 72 years.

¶ 21                                   ANALYSIS

¶ 22    Defendant now appeals, arguing against the denial of his motion to suppress. When reviewing the trial court's ruling on a motion to suppress evidence, we ordinarily apply a two-part standard of review. *People v. Eubanks*, 2019 IL 123525, ¶ 33. We will reverse the trial court's factual findings only if they are against the manifest weight of the evidence, but we review *de novo* the trial court's ultimate ruling on whether the evidence should be suppressed. *Id.* A finding is against the manifest weight of the evidence where the opposite conclusion is apparent or the findings are unreasonable, arbitrary, or not based on the evidence. *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 19. A reviewing court may consider all trial evidence in determining whether the trial court's decision denying a motion to suppress was correct. *Murdock*, 2012 IL 112362, ¶ 35.

¶ 23    To prevail on a motion to suppress evidence at the trial level, the defendant bears the burden of producing evidence and establishing a *prima facie* case that the search and seizure was unreasonable. *People v. Martin*, 2017 IL App (1st) 143255, ¶ 18; *People v. Carodine*, 374 Ill. App. 3d 16, 21 (2007). A *prima facie* showing means that the defendant has the primary responsibility for establishing the factual and legal bases for the motion to suppress. *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 15. However, once a defendant makes a *prima facie* showing of an illegal search and seizure, the burden then shifts to the State to produce evidence justifying the intrusion. *Id.* However, the ultimate burden remains with the defendant. *Id.*

¶ 24    Defendant argues he fulfilled that burden where, from the outset in this case, he was unlawfully detained and arrested when he was handcuffed without reasonable suspicion or

probable cause. Defendant also contends the investigative alert did not justify his arrest. He maintains that his incriminating statement, DNA swab, and lineup identification, which were all a result of being in custody and admitted at trial, were obtained by exploitation of the illegal arrest. Therefore, he argues the trial court erred in denying his motion to suppress since police were unreasonable in their actions.

¶ 25        Both the United States Constitution and the Illinois Constitution protect every person from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Reasonableness under the fourth amendment generally requires a warrant supported by probable cause. *People v. Johnson*, 237 Ill. 2d 81, 89 (2010); *People v. Stehman*, 203 Ill. 2d 26, 34 (2002). Probable cause exists where the facts and circumstances, considered as a whole, are sufficient to justify a belief by a reasonably cautious person that the defendant is or has been involved in a crime. *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009).

¶ 26        Nonetheless, a police officer may detain a person without having a warrant with probable cause to arrest. *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 46. Specifically, a limited exception to the warrant requirement under *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968), permits a police officer to briefly stop (and therefore necessarily seize) a person for temporary questioning if he reasonably believes the person *has committed*, or is about to commit, a crime. *Johnson*, 237 Ill. 2d at 89. A "seizure" thus occurs when an officer has in some way restrained a citizen's liberty so the person believes he is not free to leave. *Thomas*, 2019 IL App (1st) 170474, ¶ 16. Notably, reasonable suspicion is a less exacting standard than probable cause, and the evidence necessary to justify a *Terry* stop can even arise when no violation of the law is witnessed, so long as it does not constitute a mere hunch. *Maxey*, 2011 IL App (1st) 100011, ¶ 46; *People v. Walter*, 374 Ill. App. 3d 763, 774 (2007). A police officer must point to specific, articulable facts that, taken together with rational inferences, reasonably warrant the intrusion. *Walter*, 374 Ill. App. 3d at 774.

¶ 27                              *Police Made a Lawful* Terry *Stop*

¶ 28        Defendant specifically contends that police perpetrated an unlawful *Terry* stop based on an anonymous, uncorroborated tip and an illegal arrest by handcuffing him and placing him in the police wagon. The State counters that the police in this case executed a narrowly tailored lawful *Terry* stop, pursuant to the police dispatch aiming to identify a reported violent criminal, and as such, defendant was neither unlawfully seized nor detained.

¶ 29        In evaluating whether reasonable suspicion exists for the purposes of a *Terry* stop, a court should objectively consider whether the information known to the officer at the time of the stop would warrant a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity. *People v. Shafer*, 372 Ill. App. 3d 1044, 1048-49 (2007). A court should also consider the quality and content of the information in the officers' knowledge and how reliable the source is. *People v. Lampitok*, 207 Ill. 2d 231, 257 (2003). Factors to consider include whether the officers' observations corroborate the tip, whether the informant explains the basis for his knowledge of the tip, and whether the officers act immediately on the tip upon receiving it. *Id.* Police officers are also entitled to act upon information received in official communications, including radio transmissions, to initiate a *Terry* stop. *Maxey*, 2011 IL App (1st) 100011, ¶ 54. The officers' actions must be justified at the inception and reasonably related in scope to the circumstances that called for the interference in the first place. *People v. Morrison*, 375 Ill. App. 3d 545, 549 (2007).

¶ 30    Here, while it is undisputed that police acted without a warrant, the State fulfilled its burden of establishing that the police made a proper initial investigative *Terry* stop. Officer Jarvis testified that he received a 911 call over the police radio that a person wanted for two criminal sexual assaults, crimes which possibly involved threat of force or force (see 720 ILCS 5/11-1.20 (West 2010)), was sitting on a porch at 1000 W. 61st Street and wearing a green and white shirt and also green shorts. Officer Jarvis, who was on patrol in the area, proceeded to the identified location, where he observed defendant matching the description and walking alone a block and a half away at 945 W. 61st Street. Officer Jarvis's observation of defendant corroborated the initial call, giving rise to the inference that the 911 caller was credible. See *People v. Ledesma*, 206 Ill. 2d 571, 584 (2003), *overruled in part by People v. Pitman*, 211 Ill. 2d 502, 512-13 (2004);[5] *People v. Eyler*, 2019 IL App (4th) 170064, ¶ 30. The officers then questioned defendant as to his name and briefly detained him with handcuffs for officer safety while checking his identity in the police system and stating he was free to leave if cleared. *Morrison*, 375 Ill. App. 3d at 549 (noting an officer may ask a person to identify himself in the course of a *Terry* stop).

¶ 31    The officers thus had reasonable suspicion to briefly detain defendant where there was an initial tip from a 911 call, there was temporal proximity between the time of the tip and defendant's location, and defendant matched the caller's description and general location. See *Eyler*, 2019 IL App (4th) 170064, ¶ 35; *Maxey*, 2011 IL App (1st) 100011, ¶¶ 50-51; see also *Hayes v. Florida*, 470 U.S. 811, 816 (1985) (noting, if articulable facts support a reasonable suspicion that a person has committed a criminal offense, police may stop the person to identify him, question him briefly, or detain him briefly while attempting to obtain additional information).

¶ 32    In reaching this conclusion, we have considered *Florida v. J.L.*, 529 U.S. 266 (2000), on which defendant relies. In *J.L.*, police received an anonymous tip via telephone that a young black male wearing a plaid shirt was standing at a bus stop carrying a gun. The court noted there was no audio recording of the tip and nothing was known about the informant. In addition, the record did not say how long after receiving the tip that officers responded, but based on the tip, officers went to the identified bus stop. There, they encountered the defendant matching the informant's description, and although the defendant did not make threatening movements and there was no visible gun, officers had him place his hands up on the bus stop, frisked him, and seized a gun from the defendant's pocket. *Id.* at 268. The Supreme Court held that the anonymous tip at issue, without more, was insufficient to justify the *Terry* stop. *Id.* at 274; see also *People v. Henderson*, 2013 IL 114040, ¶ 30 (relying on *J.L.* in finding that a bare-bones tip from an anonymous citizen reporting a "possible gun" in a moving vehicle without any predictive information was insufficiently reliable). The Court wrote that the reasonable suspicion at issue in *J.L.* required the tip to "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person," while also noting that the likelihood of criminal activity was central in anonymous-tip cases. *J.L.*, 529 U.S. at 272.

¶ 33    Significantly, here, unlike in *J.L.*, the report was from a 911 caller. It is well established that "an emergency call to police should not be viewed as an 'anonymous' tip or with the skepticism applied to tips provided by confidential informants." *Shafer*, 372 Ill. App. 3d at

---

[5]The decision in *Ledesma* was overruled to the extent that it was inconsistent with the standard of review articulated in *Ornelas v. United States*, 517 U.S. 690 (1996).

1054; see also *Navarette v. California*, 572 U.S. 393, 400 (2014) (noting a 911 call has features that allow for identifying and tracing callers and thus provides for safeguards against "making false reports with immunity"); 720 ILCS 5/26-1(12) (West 2010) (a person may be convicted of disorderly conduct for reporting a false complaint via 911). While 911 tips are not *per se* reliable, they are a relevant circumstance in determining the caller's veracity. *Navarette*, 572 U.S. at 401. The fact that the caller in this case reported a suspected perpetrator of sexual assault implies that the caller was either a victim of the crime, an eyewitness, or knew the victim. See *id.* at 399. Also, unlike in *J.L.*, the record here shows that officers responded immediately to the call and did no more than what was necessary to investigate the suspect's identity for the alleged crime. Officer Jarvis stated, assuming there were no problems, defendant would be "on [his] way" after the momentary name-check. See *People v. Ross*, 317 Ill. App. 3d 26, 31 (2000) (the scope of the investigation must be reasonably related to the circumstances that justified the police interference and the investigation must last no longer than necessary to effectuate the purpose of the stop); see also *People v. Colyar*, 2013 IL 111835, ¶ 46.

¶ 34     This was not a report of a crime in progress, where officers could observe the suspect to gain more reasonable suspicion to support the stop, but rather a report locating a suspect for two felonies that had already occurred. Officers thus had a strong interest in solving the reported crimes and bringing the offender to justice, which outweighed the narrowly tailored intrusion. See *United States v. Hensley*, 469 U.S. 221, 229 (1985). Indeed, "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972). As such, the officers here should have been permitted to investigate the circumstances that aroused their suspicions for this completed crime notwithstanding that the record does not disclose a detailed basis for the 911 caller's knowledge as to the sexual assaults. See *Hensley*, 469 U.S. at 229 (noting, if police have reasonable suspicion that a person they encounter is wanted in connection with a completed felony, a *Terry* stop may be made to investigate that suspicion); *Eyler*, 2019 IL App (4th) 170064, ¶ 35 (noting a *Terry* stop may be justified by completed criminal activity); *People v. Fields*, 2014 IL App (1st) 130209, ¶ 25; *cf. People v. Lopez*, 2018 IL App (1st) 153331, ¶¶ 21-28 (finding a tip reporting drunk driving unreliable, where there was no evidence the tipster contacted police through an emergency number, and most importantly it was insufficient, where the allegations of wrongdoing lacked a basis for the tipster's knowledge); *Village of Mundelein v. Minx*, 352 Ill. App. 3d 216, 222 (2004) (noting a citizen-informant did not provide specific details underlying the report of "driving recklessly" to justify the officer's *Terry* stop of the vehicle).

¶ 35     Defendant nonetheless insists that 911 callers cannot be deemed reliable because they may choose to remain anonymous. In support, in his reply brief, defendant cites a PDF document issued by the city police superintendent, which states that any person reporting a crime who is not the victim may inform the 911 dispatcher that he or she wishes to remain anonymous. Defendant also referred to this document at oral arguments. We find defendant confuses anonymity with *traceability*, but the two appear mutually exclusive. Notwithstanding that, defendant cannot rely on evidence that he never presented to the trial court. *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 130 ("[M]atters not supported by the trial record are not appropriately raised on direct appeal."). It is also worth noting that, in his opening brief,

defendant simply characterized the 911 call in this case as an "anonymous call" and thus did not adequately address the body of case law cited above that distinguishes emergency callers from confidential informants. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (noting points not argued are forfeited and shall not be raised in the reply brief or in oral argument). At the motion-to-suppress hearing, once the State identified the 911 call, which was a traceable source, the State's burden of production was satisfied. See *In re A.V.*, 336 Ill. App. 3d 140, 144 (2002) (upholding the denial of the defendant's motion to suppress when informants were physically present in the park where they reported criminal activity, making them traceable, and their information was corroborated). Nothing precluded defendant from subpoenaing additional information on the caller, but defendant chose not to do so. Defendant thus failed to sustain his ultimate burden of persuasion in establishing that the police conduct was unreasonable in this case. See *People v. Brooks*, 2017 IL 121413, ¶ 22.

¶ 36   Given our conclusion, we further reject defendant's contention that the officers effected an arrest requiring probable cause specifically when they *handcuffed* defendant, placing him in the back of the police vehicle. The mere restraint of an individual or act of handcuffing does not transform an investigatory *Terry* stop into an illegal arrest. *Colyar*, 2013 IL 111835, ¶ 46; *People v. Young*, 306 Ill. App. 3d 350, 354 (1999). As a result, even though a defendant is not free to go during the investigatory stop, the stop is not an arrest. *Maxey*, 2011 IL App (1st) 100011, ¶ 60; *People v. Paskins*, 154 Ill. App. 3d 417, 422 (1987). Rather, whether to handcuff a suspect is a fact-driven determination dependent on protecting law enforcement officers, the public, or a suspect from a risk of undue harm. See *Colyar*, 2013 IL 111835, ¶¶ 45, 47; *Fields*, 2014 IL App (1st) 130209, ¶ 27; see also *People v. Ware*, 264 Ill. App. 3d 650, 655 (1994) (noting the issue is whether a reasonably prudent person in the circumstances would be justified in believing his safety or that of others was in danger). The difference between an investigatory stop and arrest does not necessarily lie in the initial restraint of movement but, rather, in the length of time the suspect is detained and the nature and scope that follows the initial stop. *People v. Walters*, 256 Ill. App. 3d 231, 237 (1994).

¶ 37   Again, Officer Jarvis specifically testified that he handcuffed defendant for "safety reasons," which seems reasonable given that defendant was alleged to have committed two felonies possibly using force or threat of force. *Cf. People v. Arnold*, 394 Ill. App. 3d 63, 71-73 (2009) (handcuffing the suspect was unreasonable given that he was wanted for a municipal ordinance violation, not a crime of violence, and the suspect did not pose a flight risk). Defendant did not challenge or rebut that evidence at the motion-to-suppress hearing.

¶ 38   We thus reject defendant's reliance on *People v. Wells*, 403 Ill. App. 3d 849 (2010), wherein this court held that handcuffing the defendant transformed what was initially a legally justified *Terry* stop into an arrest but without the necessary probable cause. There, the defendant's girlfriend called police, reporting that the defendant was outside her building, ringing her unit, and threatening to kill her over the telephone, although there was no indication he was armed. Defendant left but then about 10 minutes later returned ringing the bell again and " 'threatening to call' " his girlfriend. *Id.* at 850. The trial court granted the defendant's motion to suppress, where police, on finding the defendant walking down the block, placed him in handcuffs right away and patted him down for weapons without asking any questions. *Id.* at 850-52. This court affirmed, agreeing with the trial court that there was no basis to suspect the presence of weapons or a risk of attack. *Id.* at 860-61.

¶ 39    We find defendant's reliance on *Wells* misplaced since the crime reported to police in this case did not simply reflect verbal threats; rather, defendant was reported to have actually *committed* two criminal sexual assaults, possibly involving threat of force or force (see 720 ILCS 5/11-1.20 (West 2010)). See *Walters*, 256 Ill. App. 3d at 238 (police investigating armed robbery could reasonably conclude suspects in stopped vehicle were armed and dangerous). Although we cannot view a *Terry* stop with analytical hindsight, we feel compelled to observe that defendant did in fact violently rape and beat both women, thereby committing aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 2010)). See *Ware*, 264 Ill. App. 3d at 654 (facts supporting a *Terry* stop must be considered from the perspective of a reasonable officer at the time the situation confronted him). Moreover, here, unlike in *Wells*, police limited the scope of intrusion and did not search defendant. Thus, based on the foregoing, we reject defendant's contention that he was illegally arrested upon being handcuffed by police.

¶ 40                    *Police Had Probable Cause to Arrest Defendant*
                          *Based on the Investigative Alert*

¶ 41    We therefore conclude officers had reasonable suspicion under *Terry* to stop defendant for investigatory purposes, which moments thereafter ripened into probable cause to arrest. Here, Officer Jarvis ran defendant's name through the I-CLEAR system after handcuffing him. On doing so, the investigative alert, together with the attached photo, revealed that defendant was wanted for two criminal sexual assaults. Then finding probable cause, Officer Jarvis testified that he placed defendant under arrest and Mirandized him.

¶ 42    Defendant argues that the facts in the investigative alert did not amount to probable cause to believe he committed the sexual assaults, but we strongly disagree. The standard for determining whether probable cause exists is probability of criminal activity, rather than proof beyond a reasonable doubt. *People v. Wear*, 229 Ill. 2d 545, 564 (2008). Indeed, probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false. *Id.* In that sense, it is not a legal or technical determination but one of practicality and common sense, which analyzes the totality of the circumstances at the time of arrest. *People v. McGee*, 2015 IL App (1st) 130367, ¶ 47.

¶ 43    Here, the following facts formed the basis for the investigative alert. S.F. relayed to her son M.F. that defendant had been shot in the face or the mouth, and M.F.'s subsequent investigation of the neighborhood for such a person uncovered defendant's name. M.F. relayed this information to Detective Wiggins, who included defendant's image in a second photo array, where S.F. tentatively identified defendant as the rapist. Police then learned that defendant lived a block or so from the victim D.P.'s house, where the rapes occurred. Further, defendant indeed had been shot in the mouth and had tattoos on both his upper arms as described by the victims. Detective Wiggins testified to these facts at defendant's motion-to-suppress hearing. This established that, at the time of defendant's arrest, sufficient facts existed "to lead a reasonably cautious person to believe" he had committed a crime. See *Wear*, 229 Ill. 2d at 563-64.

¶ 44    Here, contrary to defendant's contention otherwise, Detective Wiggins's testimony established probable cause that supported the investigative alert, which justified Officer Jarvis's reliance on the alert in arresting defendant. See *McGee*, 2015 IL App (1st) 130367, ¶ 50 (upholding the denial of the motion to suppress where the underlying facts of the investigative alert, including photo array identifications of the defendant, provided probable

cause to arrest the defendant); *Maxey*, 2011 IL App (1st) 100011, ¶ 54 (arresting officers may rely upon police radio transmissions to make a *Terry* stop or an arrest even if they are unaware of the specific facts that established reasonable suspicion to initiate a *Terry* stop or probable cause to make that arrest). Where probable cause exists, police may effectuate a warrantless arrest on a person in public without violating the fourth amendment. *People v. Davis*, 398 Ill. App. 3d 940, 951 (2010); see also *McGee*, 2015 IL App (1st) 130367, ¶ 47 (warrantless arrest is valid if the police have probable cause). That is just what occurred here.

¶ 45    Defendant nonetheless maintains investigative alerts are an unconstitutional end-run around the warrant requirement. Defendant relies on *People v. Bass*, 2019 IL App (1st) 160640, ¶ 71, wherein a divided panel of this court recently held that investigative alerts, even those supported by probable cause, violated the Illinois Constitution. The *Bass* court reasoned that the Illinois Constitution and its historic interpretation required a warrant, supported by an *affidavit* (as opposed to the United States Constitution's oath or affirmation requirement) and issued by a neutral magistrate, before an officer could effect an arrest. In other words, the *Bass* court conceded that the fourth amendment to the United States Constitution permits a warrantless arrest outside the home as long as police have probable cause but determined that the Illinois Constitution went "a step beyond" the federal constitution in providing greater protections against the abuse of authority by police officers. *Id.* ¶¶ 37, 62, 71.

¶ 46    In *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 37, the defendant, in reliance on *Bass*, also argued that investigative alerts were unconstitutional. The *Braswell* court found *Bass* incorrectly decided and adopted the view outlined by Justice Mason in her partial dissent in *Bass*. *Id.* We do the same here for several reasons.

¶ 47    First, as noted in *Braswell*, the majority in *Bass* based its decision on the notion that the Chicago police use investigative alerts as an improper means of circumventing the warrant requirement. But, *Bass*, like the present case, had an underdeveloped factual record regarding the investigative alert system to support its conclusion. Justice Mason noted this rather explicitly in her dissent. See *Bass*, 2019 IL App (1st) 160640, ¶¶ 119-20 (Mason, J., concurring in part and dissenting in part). As far as this case goes, while defendant actually argued at the trial level that the investigative alert was unconstitutional (unlike the defendant in *Bass*), he left the evidentiary record wanting. For example, we do not know specifically why Detective Wiggins chose to issue an investigative alert instead of obtaining a warrant. At the pretrial hearing, Detective Wiggins merely testified that police "start off issuing investigative alerts first," making it unnecessary "at that point" to obtain a warrant. At trial, he further explained that it is "an alert that we put out on a subject, if he is ever picked up or stopped by the police, if they run his name, the police will know that he is wanted by a detective to speak to him." This explanation falls far short of understanding the system and the use of an investigative alert here. Was an alert issued first because defendant was a suspected rapist at large, and it is a more expeditious process for catching a suspect? How routine is such a process? Was an alert issued because defendant, who was periodically homeless, was unlocatable, making obtaining a warrant less pressing or less reasonable? These unanswered questions are important in understanding the matter.

¶ 48    Second, following Justice Mason's dissent, there is no reason to believe that this case (or that in *Bass*) presents one of the narrow exceptions to the limited-lockstep doctrine. As Justice Mason stated, our supreme court has consistently interpreted the Illinois Constitution's search

and seizure clause in conformity with the United States Supreme Court's interpretation of the fourth amendment. See *id.* ¶ 116 (and cases cited therein).

¶ 49    Third, we are persuaded by Justice Mason's sound reasoning:

"Although the majority is willing to assume that investigative alerts are routinely used by police to circumvent the process of obtaining a warrant, there is no apparent reason why, when police have probable cause to arrest an individual (as they did here), the use of an investigative alert gives them any untoward advantage. See 725 ILCS 5/107-2(1)(c) (West 2014) (permitting warrantless arrest when police officer 'has reasonable grounds to believe the person *** has committed an offense'); *People v. Buss*, 187 Ill. 2d 144, 204 (1999) (permitting officers to rely on the collective knowledge of other officers for purposes of establishing probable cause). The majority certainly does not articulate any. And I can perceive no principled basis on which to hold that police may arrest an individual without a warrant and without an investigative alert as long as they have probable cause, but if they issue an investigative alert based on the same facts giving rise to probable cause, they have run afoul of the Illinois Constitution." *Id.* ¶ 120.

Following that logic, we would add that barring investigative alerts seems contrary to the central requirement of the fourth amendment and Illinois's search and seizure provision, which is reasonableness. See *People v. Jones*, 215 Ill. 2d 261, 268 (2005); *People v. Evans*, 2017 IL App (4th) 140672, ¶ 17. After all, probable cause is governed by commonsense, practical considerations and not by technical legal rules. *People v. Sims*, 192 Ill. 2d 592, 615 (2000).

¶ 50    We find Justice Mason's dissent more persuasive and, accordingly, reject defendant's contention that the investigative alert in this case was unconstitutional. Defendant's arrest incident to the investigative alert was supported by probable cause.

¶ 51    *Assuming an Illegal Initial Arrest, It Was Sufficiently Attenuated*

¶ 52    Building on this, we further note that, even assuming defendant's initial *Terry* stop was an unjustified illegal arrest, any illegality was extinguished by the presence of probable cause to arrest based on the investigative alert. Given that fact, we cannot say the evidence collected while defendant was in custody, including his statement, DNA swab, and lineup identification, was obtained by exploitation of the allegedly illegal arrest. See *People v. Jackson*, 374 Ill. App. 3d 93, 101 (2007) (evidence obtained following an illegal arrest need not be suppressed if it was obtained by a means sufficiently purged from the primary taint of illegality). In evaluating whether this evidence was the product of an illegal arrest, we consider the proximity in time between the arrest and incriminating evidence, the presence of intervening circumstances, the purpose and flagrancy of the police misconduct, and whether *Miranda* warnings were given. *People v. Morris*, 209 Ill. 2d 137, 157 (2004), *overruled in part by Pitman*, 211 Ill. 2d at 512-13.[6] Based on those factors, we find the evidence sufficiently attenuated.[7]

_____

[6]The decision in *Morris* was overruled to the extent that it was inconsistent with the standard of review articulated in *Ornelas*, 517 U.S. 690.

[7]In this case, the trial court never considered attenuation, given that it found defendant was not subject to an illegal arrest. The State argues that if we conclude the *Terry* stop and arrest based on the investigative alert were unlawful, we should find defendant's lineup identifications and confession attenuated from the taint of his illegal arrest. In other words, the State argues the lineup served as intervening probable cause, extinguishing the previous illegalities. We find the record and parties'

¶ 53    As to the intervening circumstances factor, here, we note that the information giving rise to probable cause was obtained independently of defendant's alleged illegal arrest. Had the officers decided defendant's initial detention was illegal, they could have released him and then, based on the investigative alert and underlying probable cause independent of his initial arrest, immediately arrested defendant again. See *id.* at 159. The evidence collected would have been admissible. See *id.* The probable cause that would support a second arrest only moments after defendant's first arrest served to break the causal connection between defendant's first illegal arrest and the evidence collected many hours later. There was not a sufficiently close relationship between the alleged underlying illegality and the evidence collected. See *Henderson*, 2013 IL 114040, ¶ 45 (requiring a close relationship for application of the poisonous fruit doctrine). As such, the probable cause to arrest defendant developed independently of defendant's arrest, which weighs in favor of finding attenuation.

¶ 54    We consider the next factor, the proximity in time between the illegal arrest and collection of incriminating evidence. While defendant was allegedly illegally detained for a few minutes in the early morning hours by Officer Jarvis, he was immediately thereafter in lawful custody around 2:40 a.m. Defendant made his first incriminating statement to Detective Wiggins that same day around 5:30 p.m. after he was Mirandized. Following his statement, defendant agreed to the buccal swab, which eventually revealed his DNA was a match to what was found on the victims. The lineup identifications also followed. Defendant made his second incriminating statement around 9 p.m. after being Mirandized, and it was memorialized in writing and ultimately read into the record at trial. Accordingly, about 14 hours passed before police even initiated collecting the incriminating evidence. This weighs in favor of finding attenuation given that defendant was, for a majority of the time, in lawful custody. See *Morris*, 209 Ill. 2d at 161.

¶ 55    Nor was the arrest effected in a manner calculated to cause fright, surprise, or confusion, the final factor that would weigh in favor of finding attenuation. See *id.* In other words, the record does not betray a quality of "purposefulness" in that police stopped and then arrested defendant while on a fishing expedition for incriminating evidence. See *People v. Foskey*, 136 Ill. 2d 66, 86 (1990); see also *Henderson*, 2013 IL 114040, ¶ 49 (fact that officers failed to discern an anonymous tip was insufficient to justify the stop did not constitute intentional or flagrant conduct).

¶ 56    Given the total circumstances, even assuming defendant's initial *Terry* stop and arrest with the handcuffing was illegal, the taint of the illegal arrest had been purged by the time police collected any incriminating evidence from defendant. Defendant's statement, DNA swab, and lineup identification were not the "fruit" of his allegedly illegal arrest but instead were attenuated from the illegal arrest.

---

arguments insufficiently developed to analyze attenuation in that manner. The State's argument also does not take into account the DNA buccal swab, which was apparently taken from defendant before the lineup. Because of that, we have chosen to analyze attenuation after defendant's arrest based on the investigative alert, which we find was supported by probable cause and therefore legal. See *People v. Ollie*, 333 Ill. App. 3d 971, 985 (2002) (noting that we must consider whether the record on appeal is sufficiently complete to allow an independent determination on the issue of attenuation).

¶ 57                                    CONCLUSION

¶ 58    Based on the foregoing, we hold that police made a proper *Terry* stop and, on learning of the investigative alert, this ripened into probable cause to arrest defendant. The investigative alert was supported by probable cause, and we cannot say it violates the Illinois Constitution. Last, even assuming the *Terry* stop and handcuffing were improper, the evidence collected from defendant was sufficiently attenuated from any illegality. We therefore affirm the judgment of the trial court denying defendant's motion to suppress.

¶ 59    Affirmed.

¶ 60    JUSTICE PUCINSKI, specially concurring:

¶ 61    While I agree with the majority in affirming the judgment of the trial court, I do so for entirely different reasons. The facts of this case are developed fully in the majority opinion, and I will not repeat them unnecessarily.

¶ 62    Officer Jarvis received a call from the City of Chicago's Office of Emergency Management Communications (OEMC) that a black male, wanted for criminal sexual assault and wearing a green outfit, was at a certain specific location. Officer Jarvis went to that location and found a black male, in a green outfit, very near the address he was given.

¶ 63    Officer Jarvis correctly stopped the man, based on a reliable tip relayed to him by the OEMC. Tips given to police agencies are generally considered reliable because the police agency, here the OEMC, can trace the caller's information. Officer Jarvis had no reason to believe that the tip was anything but proper and that he could rely on it. "One factor in evaluating the reliability of telephone tips is whether the call was made to a police emergency number." *People v. Shafer*, 372 Ill. App. 3d 1044, 1050 (2007)

¶ 64    The defense argues that calls to Chicago's OEMC give the caller the option of remaining anonymous, but an officer on the street receiving such a call would not necessarily know whether the caller had chosen that option. In *Navarette*, the United States Supreme Court noted that "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Navarette v. California*, 572 U.S. 393, 400 (2014). This was a proper *Terry* stop, which may be justified by completed criminal activity. *People v. Timmsen*, 2016 IL 118181, ¶ 9. On this issue I agree with the majority.

¶ 65    Where we part ways is *when* the defendant was arrested. Within minutes of the OEMC call Officer Jarvis had reason to believe he had found the man wanted in connection with two violent felonies, identified by the distinctive clothing described, very near the address given. "In judging a police officer's conduct, we apply an objective standard, considering whether the facts available to the officer at the moment of the seizure justify the action taken." *People v. Hackett*, 2012 IL 111781, ¶ 29 (citing *People v. Close* 238 Ill. 2d, 497, 505 (2010)).

¶ 66    The *Terry* stop was good. However, that is not the point. What started as a *bona fide Terry* stop within seconds morphed into an arrest. Obviously, an officer cannot arrest someone without stopping that person first. Almost immediately on stopping the suspect, Officer Jarvis cuffed him and placed him in a police car. "An arrest requires either physical force *** or, where that is absent, submission to the assertion of authority." (Emphases omitted.) *California v. Hodari D.*, 499 U.S. 621, 626 (1991). The majority argues that at this point it was not an

arrest. But the suspect was not free to leave. He was cuffed and in the backseat of a police car. A police officer sat in the car with defendant. No reasonable person could believe he or she could leave under those circumstances.

¶ 67 Once the suspect was arrested, Officer Jarvis checked his in-car computer to see if there was any information linked to the man's name. It did not matter. The defendant was already arrested.

¶ 68 The arrest was good, and the same facts that supported the *Terry* stop provided Officer Jarvis with probable cause to arrest. Officer Jarvis had probable cause to believe the suspect was the man wanted for two felonies. "To effect a warrantless arrest, a police officer must have probable cause to believe that an offense was committed and that the person to be arrested committed it." *People v. Kidd*, 175 Ill. 2d 1, 22 (1996).

¶ 69 The fact that there was an investigative alert and no warrant was immaterial because the suspect was arrested before Officer Jarvis ran the name check and learned of the investigative alert.

¶ 70 This case does not require an analysis of *People v. Bass*, 2019 IL App (1st) 160640, because the investigative alert was not the reason this man was arrested. In *Bass*, the investigative alert was the only reason the defendant was arrested. Here, the call from OEMC was reliable and was the reason defendant was arrested.

¶ 71 On general principle, I continue to believe that investigative alerts are unconstitutional. The State in oral argument for this case acknowledged that there was no warrant and no affidavit in this case. The Illinois Constitution is specific, and more limiting that the United States Constitution. The Illinois Constitution states: "The people shall have the right to be secure in their persons *** against unreasonable searches [and] seizures ***. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

¶ 72 In 2012, Presiding Justice Salone and Justice Neville, in their specially concurring opinion in *Hyland*, stated that their research at that time "failed to find a constitutional or statutory provision that authorizes the creation or issuance of an investigative alert." *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 40 (Salone, P.J., specially concurring, joined by Neville, J.). It has been eight years since *Hyland*, and I cannot find any authority for investigative alerts under the Illinois Constitution or Illinois statutes either.

¶ 73 The Illinois Constitution does not have a Plan B. On this, the majority and I disagree. We do agree, however, that the circuit court's denial of defendant's motion to suppress should be affirmed.