2024 IL App (1st) 221634-U

No. 1-22-1634

Order filed August 5, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 2749 |
| | ) | |
| | ) | Honorable |
| BASILIO ALVIZURES, | ) | Earl B. Hoffenberg and |
| | ) | Michael J. Hood, |
| Defendant-Appellant. | ) | Judges, presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction where the trial court properly denied his motion to quash arrest and suppress evidence.

¶ 2    Following a jury trial, defendant Basilio Alvizures was found guilty of aggravated driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2), (d) (West 2018)) and driving with an alcohol concentration of .08 or more (625 ILCS 5/11-501(a)(1) (West 2018)) and sentenced to

30 months' probation.[1] On appeal, defendant argues the trial court erred in denying his motion to quash arrest and suppress evidence because police officers arrested him at the scene without probable cause. We affirm.

¶ 3     Defendant was charged by indictment with multiple offenses following a traffic stop on November 20, 2018.

¶ 4     Prior to trial, defendant filed a motion to quash arrest and suppress evidence, arguing that officers did not observe him commit a crime at the time he was detained, and they lacked reasonable suspicion to believe that he had committed an offense. He further argued, prior to the arrest, the arresting officer lacked probable cause to believe defendant was driving under the influence of alcohol. Defendant subsequently amended the motion to allege that the arresting officer approached defendant's vehicle, which was legally parked, and determined that defendant was drunk, after which defendant was arrested, handcuffed, and placed into a squad vehicle.

¶ 5     At the suppression hearing, Chicago police officer Carlos Ortiz testified that at 1:59 a.m. on November 20, 2018, he was a passenger in a police vehicle.[2] Ortiz was wearing his police uniform with a firearm visible. He observed a vehicle "properly" parked on Montrose Avenue with its lights on and engine running. Defendant was in the driver's seat, leaning forward with his eyes closed. Ortiz's partner turned around so they could perform a "well-being check to see if [defendant] was okay." Ortiz's partner approached the vehicle first and conversed with defendant, and Ortiz followed approximately 45 seconds later at his partner's direction. Ortiz testified that defendant was not under arrest, but was not free to leave because the officers were investigating.

---

[1] The Honorable Earl B. Hoffenberg presided over the pretrial suppression hearing, and the Honorable Michael J. Hood presided over the trial.

[2] The record establishes that a Spanish interpreter was present during proceedings.

¶ 6    Ortiz saw that defendant was awake and concluded his well-being check after approximately 20 seconds. The investigation then "switched into something further." Ortiz had detected "the strong odor of alcoholic beverage" on defendant's breath, and that he "had bloodshot, glassy eyes," and "mumbled speech." Ortiz asked defendant whether he had anything to drink, and defendant answered that he had two beers the previous day. Defendant also stated that he had been parked in that location for five hours. As Ortiz stood next to defendant's window, he did not have the opinion that defendant was drunk.

¶ 7    Ortiz asked defendant to exit the vehicle, at which point defendant was not free to leave. Ortiz did not recall whether snow was on the ground, but it was "a little cold" and "light snow" had started. Ortiz administered the horizontal gaze nystagmus (HGN) test. Ortiz testified that he did not arrest defendant for DUI following the HGN test. Ortiz identified his arrest report, and testified that the information therein was truthful and accurate. Ortiz wrote in his arrest report that the arrest date was "November 20, 2018, 1:59, for the offense of driving under the influence of alcohol, location being 3242 West Montrose Avenue, Chicago, Illinois."

¶ 8    After administering the HGN test, Ortiz transported defendant to the police station. During the transport, defendant was handcuffed and "not free to leave." Ortiz informed defendant that his vehicle would be towed, but did not recall whether he informed defendant that such action was due to defendant's arrest for DUI. The vehicle was legally parked. Ortiz agreed with defense counsel's characterization that, according to the police report, at "1:59" he arrested defendant for DUI, before he transported defendant to the police station.

¶ 9    On cross-examination, Ortiz testified that he spoke Spanish with defendant. When defendant exited the vehicle, he "seemed to be holding onto the vehicle for balance," and stated

that he had problems with his leg or hip due to arthritis. Defendant also attempted to remove his license from his wallet but seemed to have difficulty. Ortiz stated that he did not recall the exact time that he first interacted with defendant, but the alcohol and drug influence report established that the interaction began at 1:24 a.m.

¶ 10   Ortiz administered only the HGN test on the street, administering the remaining field sobriety tests at the police station, and determined that he would arrest defendant while at the police station.

¶ 11   Ortiz did not complete the field sobriety tests on the street because it was cold and starting to snow, and he believed defendant was "advanced in years, over 60 years old." Defendant had also informed Ortiz that he "had arthritis or something with his hip," which contributed to Ortiz's decision to move the field sobriety tests indoors "under better conditions and neutral ground." After transporting defendant to the police station, Ortiz noticed the "strong odor of alcoholic beverage within the [police] vehicle," which was not present beforehand. Following the field sobriety tests, Ortiz opined that defendant was intoxicated. Ortiz identified the tow report for defendant's vehicle, which established that Ortiz's partner ordered the tow at 3:05 a.m. on November 20, 2018.

¶ 12   On redirect examination, Ortiz testified that he did not determine that defendant was under the influence of alcohol when he stood by defendant's vehicle window.

¶ 13   The State then published Ortiz's body camera footage from the interaction. This footage is in the record on appeal and has been viewed by this court. The footage depicts, in relevant part, Ortiz's partner approaching the vehicle and speaking with defendant. After Ortiz's partner asks for defendant's driver's license and proof of motor vehicle insurance, defendant opens his wallet and

attempts to remove his driver's license with difficulty. Defendant states that he speaks Spanish, so Ortiz asks defendant, in Spanish, to exit the vehicle. Defendant stumbles upon exiting his vehicle and leans against it. Ortiz administers the HGN test, and then states that defendant informed him that defendant has problems with his right hip and arthritis. Ortiz states that he wants to take defendant to the station to perform the rest of the field sobriety tests and read him the Warning to Motorists. The officers discuss completing the tests at the station because of the cold, the road conditions, and defendant being "advanced in years." Ortiz's partner then handcuffs defendant.

¶ 14    Another selection from the body camera footage shows the interactions at the police station, where defendant performs the field sobriety tests and Ortiz determines that defendant failed. Ortiz's partner then notes "1:59 time of arrest."

¶ 15    Defense counsel recalled Ortiz, who testified that a sticker labeled "Seizure Notice" was placed on defendant's vehicle prior to him being transported to the police station. The seizure notice "was pursuant to the Municipal Code of the City of Chicago when a person has been taken into custody for a DUI."

¶ 16    Defense counsel then played a portion of the body camera footage. Ortiz testified that he said, "[w]e're going to relocate to the station, do the field sobriety tests, because you're driving drunk." After that statement, the seizure notice was placed on the vehicle.

¶ 17    On cross-examination, Ortiz stated that he first formed his opinion that defendant was under the influence of alcohol at the station. When they relocated defendant to the police station, the officers had the option of leaving defendant's vehicle on the scene or driving it to the station parking lot. A tow was called for the vehicle after 3 a.m., after defendant performed his field

sobriety tests, submitted to a breathalyzer test, and was Mirandized. Had Ortiz decided not to tow the vehicle, he would have returned to the scene and removed the sticker.

¶ 18    On redirect examination, Ortiz stated that the Warning to Motorists is given after a person is arrested.

¶ 19    The court continued the hearing. Defendant then filed a memorandum in support of his motion to quash arrest and suppress evidence, arguing that Ortiz determined that defendant was driving under the influence of alcohol prior to transporting defendant to the police station. Specifically, defendant contended that the footage established that defendant asked Ortiz why he was being taken to the police station and his vehicle was being towed. According to defendant, Ortiz responded in Spanish, "because you're driving drunk and under the influence of alcohol." Defendant concluded that Ortiz's statements, coupled with the "admission" that the seizure notice was affixed to a legally parked vehicle, demonstrated that defendant was taken into custody for DUI without probable cause.

¶ 20    At the continuation of the hearing, defendant repeated the argument from his memorandum The State contended that Ortiz's statements, in context, establish that he did not take defendant into custody on the scene, but escorted him to the police station to finish the investigation in better conditions. Further, the body camera footage showed that Ortiz arrested defendant at the police station after conducting the field sobriety tests. Defense counsel responded that Ortiz's actions would cause a reasonable man to believe he was being taken into custody.

¶ 21    The court reviewed the transcript from the prior hearing date. It then denied defendant's motion, commenting that Ortiz "wasn't the greatest officer" the court had seen, but the body

camera footage did not establish that defendant was arrested at the scene at 1:59 a.m. and "everything" pointed to the fact that defendant was placed under arrest at the police station.

¶ 22    The case proceeded to a jury trial on two counts of aggravated DUI. The State adduced evidence that on November 20, 2018, at approximately 1:30 a.m., Ortiz and his partner observed defendant with his head leaning forward and eyes closed in the driver's seat of his vehicle, with its engine running and headlights on, which was a parking violation. Defendant informed Ortiz that he drank two beers the previous day. Ortiz observed that defendant smelled strongly of an alcoholic beverage, had bloodshot, glassy eyes, mumbled speech, and seemed confused. Ortiz asked defendant to exit his vehicle to perform the field sobriety tests, and observed that defendant used the side of the vehicle for support and had problems balancing. Ortiz administered the HGN test, and defendant showed six clues for impairment. Because it had started to snow, Ortiz decided to conduct the rest of the field sobriety tests at the station. En route to the police station, Ortiz smelled alcohol from the back of his squad vehicle.

¶ 23    At the station, defendant performed the one-leg stand and the walk and turn tests; the former he failed because he placed his leg down more than three times, and on the latter he displayed six clues of impairment. Ortiz then arrested defendant and read him the Warning to Motorists. Defendant submitted to a breathalyzer test, which showed a breath-alcohol content of .156. The State published portions of the body camera footage from Ortiz and his partner showing the initial stop and administration of the field sobriety tests at the police station.

¶ 24    The jury found defendant guilty of both counts of DUI. The court denied defendant's postjudgment motion, wherein defendant argued that the court erred in denying his motion to quash

arrest and suppress evidence. After a hearing, the court sentenced defendant to 30 months' probation with drug and alcohol evaluation and treatment recommendations.

¶ 25    On appeal, defendant contends that the trial court erred in denying his motion to quash arrest and suppress evidence.

¶ 26    We review rulings on motions to suppress evidence under a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). First, a reviewing court gives great deference to a trial court's findings of fact and will reverse those findings only if they are against the manifest weight of the evidence. *Id*. "A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted." *Id*. Accordingly, we review the trial court's legal ruling as to whether suppression is warranted *de novo*. *Id.*

¶ 27    The defendant bears the burden of proof on a motion to suppress. *People v. Cregan*, 2014 IL 113600, ¶ 23. If the defendant makes a *prima facie* showing that the evidence was obtained pursuant to an illegal search or seizure, the burden shifts to the State to provide evidence to counter the defendant's *prima facie* case. *Id*. "The ultimate burden of proof remains with the defendant." *Id*. The reviewing court may consider evidence presented at both the suppression hearing and at trial and may affirm the trial court's suppression ruling on any basis supported by the record. *People v. Hood*, 2019 IL App (1st) 162194, ¶ 39.

¶ 28    Here, defendant argues that the police lacked probable cause to arrest him for DUI at the scene when they handcuffed him and escorted him to the police station. He argues that the encounter began as an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), but became

an illegal arrest because a reasonable person in defendant's position would have felt that he was under arrest and had no choice but to comply with the officers.

¶ 29    Police-citizen encounters are divided into three tiers: "(1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops,' which must be supported by reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Luedemann*, 222 Ill. 2d at 544. Courts also recognize another exception to the warrant requirement, "community caretaking," where officers perform some function other than investigating a crime. *Id.* at 546.

¶ 30    Under *Terry*, an officer may conduct a brief, investigatory stop where the officer "reasonably believes that the person has committed, or is about to, commit a crime." *People v. Timmsen*, 2016 IL 118181, ¶ 9. The officer must have a "reasonable, articulable suspicion" that criminal activity is afoot, which is a less demanding standard than probable cause but "must amount to more than an inchoate and unparticularized suspicion or hunch of criminal activity." (Internal quotation marks omitted.) *Id.*

¶ 31    Here, defendant concedes that his initial encounter with the officers was consensual and escalated into a *Terry* stop because the officers observed that defendant's breath smelled like an alcoholic beverage, his eyes were bloodshot and glassy, and his speech was slurred and mumbled. Defendant contends, however, that the *Terry* stop became an unlawful arrest when the officers took defendant's identification and proof of insurance, administered the HGN test, handcuffed defendant, and placed him into their squad vehicle to transport him to the police station.[3]

---

[3] More precisely, defendant asserts the *Terry* stop became an unlawful "seizure." In substance, however, defendant's argument is that a lawful detention under *Terry* transformed into an unlawful arrest.

Defendant also contends that the notice of seizure sticker Ortiz and his partner placed on defendant's vehicle provided evidence that he was being unlawfully arrested without probable cause. Defendant contends that given the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

¶ 32    "[T]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." (Internal quotation marks omitted) *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 34. "[H]andcuffing does not automatically transform a *Terry* stop into an illegal arrest," and the propriety of handcuffing a person during the *Terry* stop depends on the circumstances of each case. *People v. Colyar*, 2013 IL 111835, ¶ 46. Thus, although a defendant is not free to go during the *Terry* stop, the stop is not an arrest. *Thornton*, 2020 IL App (1st) 170753, ¶ 36. Further, the difference between a *Terry* stop and an arrest "does not necessarily lie in the initial restraint of movement but, rather, in the length of time the suspect is detained and the nature and scope that follows the initial stop." *Id.* The State bears the burden of showing that a seizure based on reasonable suspicion was sufficiently limited in scope and duration. *People v. Bennett*, 376 Ill. App. 3d 554, 565 (2007).

¶ 33    Courts have found that where a police officer has reasonable suspicion based on specific and articulable facts that a driver is under the influence of alcohol, the administration of field sobriety tests may be justified. *People v. Patel*, 2020 IL App (4th) 190917, ¶ 16. When judging an officer's conduct in detaining an individual in a vehicle based on probable cause or reasonable suspicion, we apply an objective standard, considering whether "the totality of the facts and

circumstances known to the officer at the time of the stop would warrant a reasonable and prudent person to believe a crime had been committed." (Internal quotation marks omitted.) *Id*.

¶ 34   In this case, the *Terry* stop did not transform into an illegal arrest during the course of the encounter. Ortiz testified to specific, articulable facts that provided him with reasonable suspicion that defendant was driving drunk: the smell of alcohol on defendant's breath, defendant's admission that he had consumed two beers the previous day, and defendant's bloodshot, glassy eyes and slurred, mumbled speech. See *Village of Plainfield v. Anderson*, 304 Ill. App. 3d 338, 340 (1999) (noting that the defendant smelling of alcohol with bloodshot and "glossy" eyes and slurred speech, as well as admitting that he consumed alcohol, were relevant to the contention that the officer was justified in administering field sobriety tests after an initial traffic stop). Ortiz further testified that, after exiting the vehicle, defendant appeared unbalanced and held onto the side for support, a fact which is corroborated by the video. Thus, Ortiz was justified in temporarily detaining defendant in order to administer the field sobriety tests. See *Patel*, 2020 IL App (4th) 190917, ¶ 16.

¶ 35   Neither the length of the detention nor the scope of the investigation transformed the investigatory stop into an arrest at the scene. First, handcuffing an individual does not automatically transform a *Terry* stop into an illegal arrest. *Colyar*, 2013 IL 111835, ¶ 46. Second, the record established that snow began during the initial DUI investigation on the street. Ortiz testified, and the video corroborates his testimony, that he believed that defendant was "advanced in years" and stated that he had arthritis or hip problems, and so it would be safer and "more conducive" to administer the remaining field sobriety tests inside. Defendant was then handcuffed and transported to the police station to complete the tests out of the cold and snow. See, *e.g.*,

*Bennett*, 376 Ill. App. 3d at 566 (the transportation of a defendant to the scene of a crime for a show-up was permissible "because it was minimally intrusive when compared to the benefit of the immediate investigation"); *People v. Vena*, 122 Ill. App. 3d 154, 163 (1984) (noting that transporting the defendants to the police station during a blizzard for further investigation was not more intrusive than detaining them outside or in the squad vehicle, because no evidence suggested the officers transported them for interrogation or other more intrusive actions beyond completion of the investigation).

¶ 36    Lastly, Ortiz testified that his initial encounter with defendant was at 1:24 a.m. The video establishes that the initial encounter was brief, after which defendant was handcuffed and taken to the police station, where Ortiz administered the rest of the field sobriety tests. At the conclusion of the tests, Ortiz's partner notes "1:59 time of arrest." The investigation took 35 minutes from the initial encounter to the formal arrest.[4] Thus, the record establishes that the detention only lasted as long as was necessary to complete the field sobriety tests safely and accurately, which tests established that defendant was under the influence of alcohol. See *United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."). Accordingly, we cannot say that the officers' relocation of defendant, an elderly man who was having difficulty balancing and was out in the

_____

[4] The record also establishes that the tow request for defendant's vehicle was not made until after 3 a.m., well after the stated time of arrest.

cold and snow, to the police station for the sole purpose of completing the field sobriety tests in a controlled environment was not sufficiently limited in scope and duration.

¶ 37    In sum, the trial court did not err in denying defendant's motion to quash arrest and suppress evidence because the record establishes that the officers did not arrest defendant on the scene and only did so after the conclusion of a legal investigatory detention at the police station.

¶ 38    For the foregoing reasons, we affirm defendant's conviction.

¶ 39    Affirmed.