2025 IL App (1st) 231200-U

No. 1-23-1200

Order filed February 14, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 20 CR 05445(01) |
| RAKIM JACKSON, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Charles P. Burns, |
| | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: Defendant failed to establish that his fourth amendment rights were violated and that the trial court erred in denying his motion to suppress. He also failed to establish that the armed habitual criminal (AHC) statute was unconstitutional. This court affirmed the judgment of the circuit court.

¶ 2    Following a bench trial, defendant was found guilty of being an armed habitual criminal

(AHC), and he was sentenced to 8 years and 6 months in prison. On appeal, defendant contends

the court erred in denying his motion to suppress based on an illegal search and seizure. He also

contends the AHC statute (720 ILCS 5/24-1.7(a) (West 2020)) is unconstitutional in violation of the second amendment (U.S. Const., amend II) and *New York State Rifle & Pistol Association, Inc., v. Bruen*, 597 U.S. 1 (2022).

¶ 3                                                        BACKGROUND

¶ 4      Defendant was arrested after police, during a routine traffic stop, discovered a gun on his driver's side floorboard. As defendant already had been convicted twice of aggravated unlawful use of a weapon (AUUW) (15 CR 1609101 and 18 CR 1213501), the State charged him by indictment with being an armed habitual criminal. See 720 ILCS 5/24-1.7(a) (West 2020).[1] The record shows the AUUW offenses were based on defendant's having a loaded firearm absent licenses under both the Firearm Owners Identification Card Act (FOID Card Act) (430 ILCS 65/0.01 *et seq.* (West 2020)) and the Firearm Concealed Carry Act (Concealed Carry Act) (430 ILCS 66/1 *et seq.* (West 2020)).

¶ 5      Defendant filed a motion to quash his arrest and suppress evidence. He argued the police arrested him and searched his vehicle absent probable cause, thus warranting suppression of the gun found in his vehicle. Defendant nonetheless conceded the initial stop for a traffic violation was lawful.

¶ 6      At the ensuing hearing, defendant first testified that around 11:40 p.m. on a dark evening on May 31, 2020, he was driving his GMC Envoy truck northbound by 5708 S. Western Avenue surrounded by lots of traffic. Evidence established that Western had two lanes running northbound and two lanes running southbound, plus a parking lane on each side. The truck was very high off the ground with tall front-row seats and a second row of bench seats, all with

---

[1]The legislature recently changed the title of this offense to "unlawful possession of a firearm by a repeat felony offender." 720 ILCS 5/24-1.7(a) (West Supp. 2025). The legislature also changed "aggravated unlawful use of a weapon" to "aggravated unlawful possession of a weapon." *Id*.

headrests. In addition, the windows were 5 percent tinted, and the defense presented an April 27, 2020, receipt reflecting that tinting service. Defendant also identified six photos of his vehicle, testifying that's how it looked at the time of his arrest. On cross-examination, defendant conceded these photos were taken in the daylight for the purposes of the hearing, and one could see "a little bit" of light through the back windows depicted in the photo. The license plate depicted therein was not the same as when he was arrested; rather, the temporary plate on his vehicle that day was expired. In spite of this testimony, defense counsel did not move to enter these exhibits into evidence.

¶ 7    Defendant continued, explaining that he was driving in the left lane when an unmarked car activated its siren and lights behind him. On cross, defendant stated that unmarked car also shined Mars lights on his truck and that he bent forward in his seat before he pulled over. Defendant testified that he hesitated to pull over immediately because he had to switch lanes before stopping in the right lane. After doing so, two police officers then approached his truck on either side. Defendant complied with one officer's request to roll down all four windows completely. The officer on the driver's side asked defendant for his license and insurance, which defendant provided and the officer then took to the police car parked directly behind him. Another unmarked police "back-up" car arrived, and two more officers approached defendant's vehicle.

¶ 8    Meanwhile, the officer with defendant's license returned, stating "Everything is good but can I search your car," to which defendant said no, asking the officer why he would want to do so. The officer then reached his hand inside the open window, unlocked the door, and "yanked" defendant out of the car without ever asking defendant to exit on his own. Thus, he never refused to get out of the car. Police took him to the back of his GMC and searched his pockets, pulled his

pants up, and shook them. The police, according to defendant, never asked him if they could search his vehicle or whether he had a concealed carry license or FOID card. They did not have a warrant. The police found a .22 handgun in the car, which defendant admitted to having placed in a latched mini-compartment under the driver's seat when he entered the GMC that day. Defendant thus denied having a 3-to-4-inch gun between his legs or by his feet, and he denied that the gun was in plain view. He had not put the gun in the compartment when police were behind him or approaching his GMC.

¶ 9       On cross, he admitted there was no photo of the under-seat compartment where his gun had been encased. He also admitted that when the police first spoke to him, they had flashlights, although they were not turned on. He claimed he was not nervous while speaking to officers, even though he knew he had a gun in the car that he did not want officers to find and the gun was not allowed in the vehicle. Defendant further admitted that an officer emerged from the second police vehicle, which parked at an angle in front of him, and approached him from the front. That's when the officer at his window grabbed his arms and reached in the car. Defendant rested.

¶ 10     The State called Chicago police officer Nathan Smith, who testified that on May 31, 2020, around 11:40 p.m., he was working near 59th Street and Western Avenue driving an unmarked Ford Explorer police vehicle equipped with two spotlights, oscillating lights, and sirens. Officer Smith and fellow officers Sweiss, Scanlon and Rosner, clad in police uniforms, were patrolling the district, which had seen ongoing daytime looting and had received calls of "shots fired" throughout that night. On cross, Officer Smith noted that they were also assigned to a "gun team" whose primary function was to recover guns. The day in question, May 31, 2020, followed a weekend full of looting downtown, as well. While Officer Smith drove southbound on Western, his front passenger Officer Sweiss alerted him to a northbound vehicle driving

without taillights. After making a U-turn, Officer Smith observed it was a GMC SUV with temporary license plates, which he learned were expired. Officer Smith positioned his vehicle directly behind the GMC in the left lane and activated his lights and sirens. The GMC momentarily slowed but did not pull over right away. After a few seconds, it entered the right lane, and eventually stopped there. On cross, Officer Smith stated that there were no other vehicles obstructing defendant's ability to pull to the right, yet defendant did not pull over immediately.

¶ 11    Meanwhile, Officer Sweiss activated two spotlights as the GMC slowed and entered the right lane. Officer Smith observed the driver's silhouette bend down and then sit back up. He did not notice any tinted windows. After the vehicle stopped in the right lane, Officer Smith and his partners approached the GMC, with two on each side, and their flashlights were illuminated. Officer Smith specifically approached the driver's side window, which defendant rolled down. Officer Smith, who stood slightly behind defendant, could see his knees, upper torso, and the car dashboard. Defendant, the only occupant of the GMC, handed over his driver's license pursuant to Officer Smith's orders. While doing so, defendant had a shaking hand and was breathing very heavily. Officer Smith then asked defendant to step out of the GMC, citing as reasons defendant's nervous actions, the calls of shots fired, and the prolonged course of defendant's initial stop. On cross, Officer Smith added that those factors and defendant's having bent down prior to the stop, led him to believe defendant was concealing contraband. Officer Smith then asked defendant to step out of the GMC a second time, but defendant did not comply in either instance. On cross, Officer Smith stated he asked defendant "numerous times" to step out of the vehicle.

¶ 12    Officer Scanlon returned to the police vehicle, repositioning it in front of defendant's GMC at a 45-degree angle to prevent him from fleeing. As Officer Scanlon returned to the scene and while standing by defendant's driver's side mirror with his flashlight illuminated, Officer Scanlon alerted the other officers to the presence of a gun. Officer Scanlon reached into the window and grabbed defendant's hands. Officer Smith then quickly unlocked the driver's side door, opened it, and grabbed the loaded handgun, positioned at defendant's feet in plain view on the floorboard. Officer Smith was unable to see the gun at first because he could not see defendant's feet. Officer Smith unloaded the gun at the squad SUV and verified that defendant did not posses a FOID or concealed carry license. He also made an in-court identification of defendant as the driver that day. On cross, he stated one of his teammates physically removed defendant from the vehicle. The State rested.

¶ 13    Following arguments, during which the court noted the defense had not entered the photographic exhibits into evidence, the court found Officer Smith more credible than defendant. The court determined that police implemented a lawful traffic stop. This gave police the right to approach defendant's vehicle and ask him to exit. Police then lawfully recovered the gun in plain view. Accordingly, the court denied defendant's motion to quash arrest and suppress evidence.

¶ 14    On October 11, 2022, almost exactly a year after the motion to suppress hearing, the cause proceeded to a bench trial. Officer Smith testified at trial largely the same as at the suppression hearing. He clarified that defendant made the bending-over movement while the GMC was still slowly pulling over and, after he activated his lights, the GMC traveled about a half city block before stopping. Officer Smith added that the recovered gun was a .22 caliber silver revolver with gray duct tape on the handle. He attempted to unload the gun, but was struggling and so he handed it to Officer Scanlon, who unloaded it, and handed it back to Officer

Smith. Inside, Officer Smith observed five live rounds. Officer Smith identified the gun and ammunition in open court as items he recovered on the evening in question.

¶ 15     On cross, he clarified that he was on routine patrol and not a gun mission at the time of the stop. In addition, Officer Smith did not recall whether the GMC's windows were tinted but identified the defense exhibit 1, a photo of the GMC taken in daylight, as the vehicle they pulled over. He did not know when the photo was taken. He acknowledged that it appeared the windows were indeed tinted. After he stopped defendant and asked for his driver's license, Officer Smith placed the license in his pocket while they talked for 15 to 30 seconds. Officer Smith added that he also believed defendant was possibly armed and a flight risk. Officer Smith asked defendant to exit his vehicle two or three times before Officer Scanlon then moved the police vehicle in front of defendant's. The recovered gun fit "in the side" of his palm and was "something like" three or four inches in size. Officer Smith stated he attempted to unload the weapon at the rear of defendant's vehicle; he thus corrected his earlier testimony at the suppression hearing, wherein he stated he unloaded the weapon behind the police vehicle.

¶ 16     The State also called Officer Michael Scanlon. His combined testimony on direct and cross revealed that on May 31, 2020, he was in the rear passenger seat of the unmarked police SUV with three partners. Around 11:40 p.m. in the area of 59th and Western, they did a U-turn and, using emergency equipment, effectuated a traffic stop of the northbound GMC Envoy, which was originally in the left lane. As they pulled over defendant's vehicle to the right, Officer Sweiss used a spotlight to illuminate defendant's truck, and Officer Scanlon also observed defendant lean forward and then back in his seat. Defendant did not pull over immediately, instead taking about half a block to do so. He did not recall the windows being tinted. The

officers approached the GMC, with Officer Scanlon at the front passenger door. He identified defendant in court as the driver and sole occupant of the GMC.

¶ 17    Officer Scanlon testified that after repositioning the squad car and as he was returning to defendant's vehicle, his flashlight illuminated the inside of defendant's driver's side window and specifically the floorboard. It was then that Officer Scanlon saw a silver revolver with duct tape between defendant's feet. Officer Scanlon alerted the other officers to the presence of the gun and then grabbed defendant's hands as Officer Smith recovered the gun. Officers Scanlon, Sweiss and Rosner took defendant out of his vehicle. Officer Scanlon unloaded the gun. He, too, identified the gun and ammunition as that recovered in May 2020. Defense counsel asked Officer Scanlon about his grand jury testimony that he had recovered the gun "on" the driver's side door. Officer Scanlon did not recall the testimony and reiterated that the gun was recovered from the floor.

¶ 18    The State entered into evidence defendant's registration records for the GMC, title, and the recovered gun and ammunition. The parties entered a stipulation that defendant previously had been convicted of two qualifying felony offenses, including two separate offenses of AUUW. The State rested. Defendant entered into evidence exhibit 1. Defendant moved for a directed verdict, which was denied. The defense rested.

¶ 19    Following evidence and argument, the court found defendant guilty as charged. In doing so, the court found Officer Scanlon also was credible, and specifically, that Officer Scanlon approached the driver's side of the GMC registered to defendant, shined the flashlight inside, and observed a handgun between defendant's feet in plain view. Defendant was sentenced as set forth to 8 years and 6 months in prison.

¶ 20    Defendant appealed.

¶ 21                                    ANALYSIS

¶ 22                          *Fourth Amendment Challenge*

¶ 23    Defendant now challenges the trial court's denial of his motion to suppress, arguing that police violated his fourth amendment right to be free from unreasonable search and seizure. See U.S. Const., amend. IV; see also Ill. Const. 1970, art. I, § 6. When reviewing such a ruling, we ordinarily apply a two-part standard of review. *People v. Eubanks*, 2019 IL 123525, ¶ 33. We will reverse the trial court's factual findings only if they are against the manifest weight of the evidence (*i.e.*, where the opposite conclusion is apparent or the findings are unreasonable, arbitrary, or not based on the evidence), but we review *de novo* the trial court's ultimate ruling on whether the evidence should be suppressed. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006); *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 22. In doing so, this court may consider evidence adduced at both the suppression hearing and trial. *People v. Smith*, 2015 IL App (1st) 131307, ¶ 20.

¶ 24    The defendant bears the burden of proof at a hearing on a motion to suppress. *People v. Brooks*, 2017 IL 121413, ¶ 22; *People v. Dunmire*, 2019 IL App (4th) 190316, ¶ 34; 725 ILCS 5/114-12 (West 2020). If the defendant makes a *prima facie* showing that the evidence was obtained through an illegal search or seizure, the burden then shifts to the State, which must produce evidence justifying the intrusion. *Id.*; *Thornton*, 2020 IL App (1st) 170753, ¶ 23. However, "[t]he ultimate burden of proof remains with the defendant." *Brooks*, 2017 IL 121413, ¶ 22.

¶ 25    Where, as here, police have probable cause to believe that a traffic violation has occurred, the decision to stop a vehicle is reasonable. See *People v. Hackett*, 2012 IL 111781, ¶ 20. Defendant does not now challenge the initial vehicular stop based on his broken taillights and

expired temporary license plates. Rather, defendant contends police unlawfully *extended* the stop with their continued questioning and pocketing of his license absent reasonable suspicion or probable cause. He maintains Officer Scanlon also had no lawful basis to block his vehicle.

¶ 26    The touchstone of the fourth amendment is reasonableness in all circumstances of the governmental invasion of a citizen's personal security. *People v. Timmsen*, 2016 IL 118181, ¶ 9. Although reasonableness under the fourth amendment generally requires a warrant supported by probable cause, a limited exception to that requirement exists under *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). *People v. Johnson*, 237 Ill. 2d 81, 89 (2010); *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 25-26. *Terry* permits a police officer to briefly stop (and therefore necessarily seize) a person for temporary questioning if he reasonably believes the person has committed, or is about to commit, a crime. *Timmsen*, 2016 IL 118181, ¶ 9; *Thornton*, 2020 IL App (1st) 170753, ¶ 26. A police officer must point to specific, articulable facts that, taken together with rational inferences, reasonably warrant the intrusion. *Id*. Although less demanding than probable cause, under this standard, an officer's suspicion must amount to more than an inchoate, unparticularized suspicion or hunch of criminal activity. *Timmsen*, 2016 IL 118181, ¶ 9. Stopping a vehicle and detaining its occupants constitutes a seizure under the fourth amendment that's also analyzed in light of *Terry*. *Timmsen*, 2016 IL 118181, ¶ 9.

¶ 27    Here, after effectuating a lawful traffic stop, Officer Smith approached defendant's driver's side window and requested that defendant hand over his driver's license. Defendant did so with a shaking hand and while breathing heavily. Officer Smith then asked defendant to exit his vehicle at least twice (on cross, he stated it was "numerous" times), and defendant did not comply. It's well established that following a lawful traffic stop, police may, as a matter of course, order the driver and any passengers out of the vehicle pending completion of the stop

without violating the protections of the fourth amendment. *People v. Sorensen*, 196 Ill. 2d 425, 433 (2001). Police can also question the vehicle's occupants, even on matters unrelated to the justified traffic stop, provided the inquires do not unnecessarily extend the duration of the stop. *People v. Bass*, 2021 IL 125434, ¶ 18; *People v. Sutton*, 2020 IL App (1st) 181616, ¶ 21; see also *Rodriguez v. U.S.*, 575 U.S. 348, 350-51 (2015) (a seizure based on a traffic violation becomes unlawful if prolonged past the time reasonably required to complete the traffic violation ticket); *People v. Jones*, 215 Ill. 2d 261, 270-71 (2005) (the investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop).

¶ 28    Defendant complains that Officer Smith spoke to him at the driver's side window for 15 to 30 seconds *too long* after pocketing his license, thus unlawfully extending the traffic seizure. The record, however, suggests Officer Smith was asking defendant to exit his vehicle at that time, which is lawful. Defendant has not supported his claim that the continued detention was unrelated to the traffic stop. Regardless, defendant fails to point to any legal authority showing a 15- to 30-second conversation after a request for a license is unreasonable, prolonged, or betrays a lack of diligence.

¶ 29    Moreover, on asking defendant to exit the vehicle, Officer Smith had reasonable suspicion to believe defendant had or was about to commit a crime. Reasonable suspicion may independently justify extending a traffic stop, and officers can also attend to safety concerns during a traffic stop. *Rodriguez*, 575 U.S. at 355; *Bass*, 2021 IL 125434, ¶ 19; *People v. Cummings*, 2016 IL 115769, ¶ 16 (noting, it's the traffic stop itself that generates danger for officers). We apply an objective standard, considering whether the facts available at the moment of seizure justify the action taken. *Hackett*, 2012 IL 111781, ¶ 29. We give due weight to the specific reasonable inferences an officer is entitled to draw in light of his experience, recognizing

that roadside encounters between police and suspects are especially hazardous. *Sorenson*, 196 Ill. 2d at 433; *People v. Smith*, 2015 IL App (1st)131307, ¶ 24.

¶ 30    Here, the facts then available to the police showed that when officers initially shined the spotlight on defendant's vehicle, he bent down and then sat back up; he did not pull over immediately, instead taking about a half block to do so, although there were no vehicles obstructing his path; as set forth, he exhibited nervousness on handing over his license; and he had expired temporary plates and no taillights. It was late at night and dark outside. In addition, Officer Smith explained that the officers stopped defendant's vehicle during a period of looting and shooting in the police district and following a weekend of downtown looting at the height of the pandemic. Police can take into account a high-crime area, plus a defendant's nervous, evasive behavior. See *Timmsen*, 2016 IL 118181, ¶ 13; *People v. Salgado*, 2019 IL App (1st) 171377, ¶ 31.

¶ 31    Considering the total circumstances, as we must, police unquestionably were justified in asking defendant exit his vehicle, and any reasonable suspicion was only heightened when defendant declined to do so. See *Timmsen*, 2016 IL 118181, ¶ 9; *cf. People v. Ruffin*, 315 Ill. App. 3d 744, 749-50 (2000) (reversing the trial court's denial of motion to suppress, where the defendant was detained 10 minutes beyond the time for issuing a traffic ticket and absent a reasonable, articulable suspicion to prolong the detention); *People v. Collins*, 53 Ill. App. 3d 253, 256 (1977) (finding the defendant's bending down gesture alone was insufficient grounds for search). Officer Smith testified the above-stated factors led him to believe defendant was concealing contraband or was possibly armed and a flight risk. Contrary to defendant's contention otherwise, the implication is that Officer Smith feared for his safety. These facts and inferences drawn also justified Officer Scanlon's further seizure of defendant by blocking his

vehicle with that of the police. Then, on viewing defendant's gun on the floorboard in plain view, police had both reasonable suspicion and probable cause to seize it for officer safety. See *Jones*, 215 Ill. 2d at 271-72 (describing plain view doctrine).

¶ 32　The trial court found Officer Smith more credible than defendant and the seizure justified. Trial evidence, and Officer Scanlon's testimony about the stop, which was consistent with that of Officer Smith's, further supported the court's determination. We cannot say the opposite conclusion is warranted or that the trial court's findings were against the manifest weight of the evidence. Defendant did not fulfill his burden of establishing a fourth amendment violation. See *Thornton*, 2020 IL App (1st) 170753, ¶ 23.

¶ 33　We therefore reject defendant's contention that the officers' testimony was incredible based on the physical evidence. Defendant points to the defense's photos of the vehicle, but these were taken after the incident, and defendant did not enter them into evidence at the suppression hearing. Moreover, we can't say the court's factual findings were unreasonable or arbitrary, where officers could first see defendant's bending silhouette with the aid of a police spotlight. Defendant, himself, testified that he bent forward in his seat (although he denied having the gun at his feet). It's also logical that Officer Smith initially was unable to see the gun, as Officer Smith took a precautionary stance slightly behind the driver's side window, and testified he could only see defendant's knees. Nor is it illogical that Officer Scanlon, on walking by the driver's side mirror with his flashlight illuminated, would be confronted by the silver revolver with duct tape at defendant's feet.[2] Officer Smith testified the window was rolled down. Although defendant claims the gun was too small to see in plain view, it was entered into

---

[2]Defendant's additional argument that Officer Scanlon could not have seen the gun based on the height of the GMC Envoy runs into the same problems. He did not enter into evidence the photos of the Envoy at the hearing. Defendant also did not elicit testimony as to Officer Scanlon's height.

evidence at trial, and the trial court ultimately ruled to the contrary. In finding defendant guilty, the trial court stated that while the gun was "small," it had a barrel, trigger, and handle, and thus, "all the characteristics of a weapon." The trial court was in a superior position to assess witness credibility and weigh the evidence, and we defer to its determinations. See *People v. Gherna*, 203 Ill. 2d 165, 175 (2003).

¶ 34    We also reject defendant's contention that officers were required to first determine if he was carrying a FOID card and concealed carry license before seizing his weapon and arresting him. Such an argument has been raised and rejected already. The existence of a possible innocent explanation, like defendant's possession of the required gun licenses, does not negate the reasonable suspicion and probable cause in this case given the totality of the factors present. See *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 32; *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 39. Defendant's behavior and his failure to volunteer that he had the required gun licensure supports that he illegally possessed the gun. *McMichaels*, 2019 IL App (1st) 163053, ¶¶ 38-39; see also *People v. Harvey*, 2024 IL 129357, ¶ 20 (noting, "it is reasonable to assume that an innocent person, when speaking to the police and aware that his conduct is being challenged, will offer an explanation for that conduct if one is available"); *People v. Hood*, 2019 IL App (1st) 162194, ¶ 71. Police could seize both defendant and the gun to ensure officer safety. See *Sorensen*, 196 Ill. 2d at 433. For all the reasons stated, defendant's fourth amendment challenge fails.

¶ 35                            *Second Amendment Challenge*

¶ 36    Defendant next contends for the first time on appeal that the AHC statute (720 ILCS 5/24-1.7(a) (West 2020)) is unconstitutional, in violation of the second amendment (U.S. Const., amend II) and *New York State Rifle & Pistol Association, Inc., v. Bruen*, 597 U.S. 1 (2022). The

second amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. Ordinary, law-abiding Americans have an individual right, made applicable to the states, to possess a handgun for self-defense inside and outside the home. *Bruen*, 597 U.S. at 9-10. In *Bruen*, our Supreme Court recently announced a new analytical framework for evaluating the constitutionality of firearm regulations. First, courts must determine whether the second amendment plainly covers an individual's conduct. *Id*. at 24. If it does, the constitution "presumptively protects that conduct," and the State bears the burden of justifying the regulation by showing it's consistent with our country's history of firearm regulation. *Id*.

¶ 37    Here, in addition to raising a facial challenge that the AHC improperly revokes his right to bear arms based on his felon status, defendant specifically contends that AHC statute is unconstitutional when applied to individuals, like himself, whose felony convictions are non-violent in nature. The State responds that defendant forfeited his as-applied challenge by failing to raise it below, and in any event, his claims fail. The State contends the plain text of the second amendment does not cover felons like defendant, and the AHC is consistent with our country's regulatory history.

¶ 38    The AHC statute, the regulation now at issue, criminalizes public firearm possession by anyone already convicted two or more times of aggravated unlawful use of a weapon (AUUW). 720 ILCS 5/24-1.7(a) (West 2020). Moreover, in Illinois, a person must be issued a FOID card (see 430 ILCS 65/2(a) (West 2020)), in order to lawfully possess a gun, and in order to obtain a concealed carry license (430 ILCS 66/25 (West 2020). A FOID card can be denied to a convicted felon. 430 ILCS 65/8 (West 2020). Here, the parties stipulated that defendant had two prior

qualifying convictions for AUUW. Defendant's mittimuses indicate the two prior felonies were based on defendant's public possession of a weapon absent a concealed carry license and FOID card, although there was no discussion of whether the felonies were violent or non-violent in nature. See 720 ILCS 5/24-1.6(a)(1), (3)(A-5), (3)(C) (West 2014) and 720 ILCS 5/24-1.6(a)(1), (3)(A-5) (West 2018). However, there is no dispute that defendant qualified as an armed habitual criminal under the statute, and he did not possess the required gun licensure when police stopped him in May 2020.

¶ 39    Legislative enactments like the AHC statute enjoy a strong presumption of constitutionality, and the burden then rests on the defendant to demonstrate the invalidity of a particular statute. *People v. Alcozer*, 241 Ill. 2d 248, 259 (2011). A defendant raising an as-applied constitutional challenge must demonstrate that the statute violates the constitution as it applies to his particular facts and circumstances, and as to a facial challenge, he must show that the statute is unconstitutional under any set of facts. *People v. Thompson*, 2015 IL 118151, ¶ 36. A reviewing court has the duty to construe a statute to uphold its validity whenever reasonably possible. *Id*. We review the constitutionality of a statute *de novo*. *Id*.

¶ 40    Courts are divided as to whether forfeiture may bar the as-applied constitutional challenge in this instance. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶¶ 55-62 (excusing forfeiture); *People v. Travis*, 2024 IL App (3d) 230113, ¶ 17 (same); *but see People v. Johnson*, 2024 IL App (1st) 231155, ¶ 28 (declining to excuse forfeiture); *People v. Shannon*, 2024 IL App (1st) 230042, ¶ 23 (same). Here, we do not know what facts accompanied his underlying crimes of public gun possession. The record as to the nature of defendant's underlying felonies remains underdeveloped, making review of his as-applied claim premature.

¶ 41 However, regardless and for varying reasons, this court has uniformly rejected defendant's same facial and as-applied constitutional challenges to the AHC statute and similar laws. See *Johnson*, 2024 IL App (1st) 231155, ¶¶ 25, 28; *People v. Stephens*, 2024 IL App (5th) 220828, ¶ 39; *People v. Kelley*, 2024 IL App (1st) 230569, ¶ 30; *Travis*, 2024 IL App (3d) 230113, ¶ 43; *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 61; *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37; *Brooks*, 2023 IL App (1st) 200435, ¶¶ 100-105; *People v. Mobley*, 2023 IL App (1st) 221264, ¶ 35; see also *People v. Ramirez*, 2023 IL 128123, ¶ 27 (suggesting the second amendment protects gun possession by law-abiding individuals); but see *United States v. Prince*, 700 F. Supp. 3d 663, 675-76 (N.D. Ill. Nov. 2, 2023) (concluding a federal statute prohibiting possession of firearms by convicted felons violated the second amendment under *Bruen*). Defendant's challenges to the AHC statute therefore fail in any event, as it's clear Illinois may disarm felons without violating the second amendment.

¶ 42 We note the recent Supreme Court decision in *United States v. Rahimi*, 602 U.S. 680, 701-02 (2024), suggests our conclusion is correct. *Rahimi* held that a domestic abuser posing a credible threat to another's physical safety could be temporarily disarmed under the Second Amendment. In so holding, the court noted its prior ruling that prohibitions on felons possessing firearms are presumptively lawful. *Id*. at 699; see also *Johnson*, 2024 IL App (1st) 231155, ¶ 25 (citing *Rahimi* with approval in denying facial challenge to the prohibition on felon gun possession after noting, "[w]hile not all felons necessarily pose a threat of violence to others, some felons surely do").

¶ 43 Defendant also maintains his underlying AUUW felony convictions are unconstitutional under *Bruen* and therefore void. He argues that Illinois' gun licensing regime runs afoul of the

second amendment. As set forth, the AUUW statute criminalizes gun possession absent the required licensure. See 720 ILCS 5/24-1.6(a)(1), (3)(A-5), (a)(3)(C) (West 2020).

¶ 44    *Bruen* itself, however, essentially condoned the constitutionality of Illinois' gun licensing regime. *Bruen*, 597 U.S. at 13, n. 1, and at 38, n. 9 (suggesting that "shall-issue" licensing regimes, of which Illinois is one, are generally constitutional), 79-80 (J. Kavanaugh, concurring) (clarifying the court's decision did not affect "shall-issue" licensing schemes like those in Illinois and such licensing regimes may continue to be employed); *People v. Gunn*, 2023 IL App (1st) 221032, ¶ 16 (noting, "Illinois is known as a shall-issue state because the police must issue a FOID card to any applicant who fulfills the criteria set forth in the statute"); see also 430 ILCS 66/10, 25 (West 2020). Moreover, this court has concluded that the challenged section of the AUUW statute is not facially unconstitutional under *Bruen*. *People v. Doehring*, 2024 IL App (1st) 230384, ¶¶ 17-31; *People v. Thompson*, 2024 IL App (1st) 221031, ¶ 43; *Hatcher*, 2024 IL App (1st) 220455, ¶¶ 48-61. Other decisions of this court have essentially concluded the same. *Gunn*, 2023 IL App (1st) 221032, ¶¶ 19, 30 (holding the FOID Card Act, Concealed Carry Act, and AUUW statute comply with federal law and are not invalid under *Bruen*); see also *People v. Burns*, 2024 IL App (4th) 230428, ¶ 42. Defendant's challenge to the AUUW statute therefore also fails.

¶ 45                                    CONCLUSION

¶ 46    For the reasons stated, defendant's claims fail. We affirm the judgment of the circuit court.

¶ 47    Affirmed.